No. 23-469

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOHN HOLCOMB,

Defendant-Appellant.

On Appeal from United States District Court
Western District of Washington at Seattle
District Court Case No. 2:21-cr-075-RSL

The Honorable Robert S. Lasnik
United States District Judge

**FURTHER EXCERPTS OF RECORD
VOLUME 1 of 1**

Colin Fieman
Alan Zarky
Attorneys for John Holcomb
Federal Public Defender's Office
1601 5th Avenue, Suite 700
Seattle, WA 98101
206-553-1100
Colin_Fieman@fd.org
Alan_Zarky @fd.org

**<u>Volume 1</u>**

Defendant's Reply to Government Response to Defendant's Motion to Suppress
Filed April 8, 2022
Docket No. 49 ...........................................................................................3

Verbatim Report of Court Proceedings on May 11, 2022
Filed May 24, 2022
Docket No. 59 ...........................................................................................30

THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 21-0075-RSL |
| Plaintiff, | ) | |
| | ) | REPLY TO GOVERNMENT'S |
| v. | ) | RESPONSE TO MOTION TO |
| | ) | SUPPRESS |
| JOHN HOLCOMB, | ) | |
| Defendant. | ) | |

## I.   Introduction

The government admits that the Riquelme warrant gave police the authority to search the entirety of all devices, including all separate hard drives, belonging to Mr. Holcomb but denies that the warrant is a general warrant.[1] Dkt. 41 at 23-24. Additionally, it appears the government now justifies that authority based on the evidence that law enforcement discovered.[2] The government's reasoning to support the

---

[1] When the government states "there would have been no other way for the police to identify and seize responsive evidence" (Dkt. 41 at 24), it ignores search protocols and filters available to law enforcement, as well as Mr. Holcomb's attempts to educate the government on how to search the devices at issue while complying with the Fourth Amendment. Dkt. 35-3 at 9-28; Ex. 1. That the government is unable to derive a method with search and date protocols, even after Mr. Holcomb filed motions to suppress in Washington state and in the instant federal case, suggests suppression would deter a general search in the future.

[2] Setting aside the presumption of innocence, the government's post-temporal analysis offers no assistance because reasonableness is based on information officers had in their possession when the search or seizure occurred. *Saucier v. Katz*, 533 U.S. 194, 206

1   search of the lower hard drive invites error.[3] The government attempts to create offense

2   specific exceptions to the Fourth Amendment also invites error.[4]

3        Mr. Holcomb endeavors to address the government's opposition without waiving

4   any claims he has raised in his opening motion.[5] Because the government defends the

5   search, citing only to the Riquelme warrant, Mr. Holcomb focuses on that warrant and

6   the circumstances surrounding it.[6]  The Riquelme warrant, referred to by the

7   government as "the computer" warrant, facially violates the Fourth Amendment or, in

8   the alternative, law enforcement executed the warrant in violation of terms of the

9   warrant.

---

(2001) (Receded from on other grounds in *Pearson v. Callahan*, 555 U.S. 223 (2009)).
This was not a child pornography investigation.

[3] *See* Ex. 2 (redactions not in originals).

[4] *Mincey v. Arizona*, 437 U.S. 385, 393 (1978) ("If the warrantless search of a homicide
scene is reasonable, why not the warrantless search of the scene of a rape, a robbery, or
a burglary? 'No consideration relevant to the Fourth Amendment suggests any point of
rational limitation' of such a doctrine.")

[5] The government should have produced the warrant it intended to rely on months ago
because it knew the exact contours of Mr. Holcomb's suppression argument, which
counsel disclosed on the record at the initial appearance and where the Court entered an
order under the Due Process Protection Act (DPPA). Dkt. 12-13, 28.

To suggest that arguments are waived under such circumstances is wrong and unfair.
Dkt. 41 at 28, fn. 8.  Also "claims," not "arguments" are waived.  *United States v.
Lillard*, 935 F.3d 827, 833 (9th Cir. 2019) (internal citations omitted); *Yee v.
Escondido*, 503 U.S. 519, 534 (1992). It is the government's burden to raise claims and
arguments justifying the search. It is not for Mr. Holcomb to speculate which arguments
the government might make and reply to hypothetical government positions in his
opening motion to suppress.

[6] To the extent they apply, all arguments raised as to the Riquelme warrant apply to the
other warrants as well.

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 2

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

II.   **The government's opposition rests on the Court's interpretation of the Riquelme warrant and the manner in which it was executed – and since it was disclosed recently, additional background and context is necessary.**

The recently disclosed Riquelme warrant states that the judge believed that Mr. Holcomb committed Rape in the second degree in violation of RCW 9A.44.050. Dkt. 41-1. The portion of the statute relevant to Mr. Holcomb's case prohibits an individual from engaging in sexual intercourse with another person by forcible compulsion. RCW 9A.44.050(1)(a). However, "once a defendant asserts a consent defense and provides sufficient evidence to support the defense, the State bears the burden of proving lack of consent as part of its proof of the element of forcible compulsion." *State v. W.R.*, 181 Wash.2d 757, 763, 336 P.3d 1134 (2014). "Forcible compulsion means that 'the force exerted was [(1)] directed at overcoming the victim's resistance and [(2)] was more than that which is normally required to achieve penetration.'" *State v. Wright*, 152 Wash.App. 64, 71, 214 P.3d 968 (2009) (quoting *State v. McKnight*, 54 Wash.App. 521, 528, 774 P.2d 532 (1989)). In other words, "[f]orcible compulsion is not the force inherent in any act of sexual touching, but rather is that 'used or threatened to overcome or prevent resistance by the [victim].' " *State v. Ritola*, 63 Wash.App. 252, 254–55, 817 P.2d 1390 (1991) (quoting *McKnight*, 54 Wash.App. at 527, 774 P.2d 532).

On January 28, 2020, Judge Svaren gave police the authority to seize items from Mr. Holcomb's residence. Dkt. 35-1 at 23-24. As to digital devices, the Svaren warrant only allowed officers to seize – not search – the "(s)uspects cell phone" and "(d)esktop computer located in the living room." Dkt. 35-1 at 15-16. On January 28, Mr. Holcomb gave law enforcement permission to search the "Dell laptop (grey) 'XPS'," "Cooler Master Computer Tower," and "Google Smartphone Pixel 2" with the understanding that he could "withdraw or revoke consent at any time" and "limit the scope of the consent." Dkt. 35-1 at 32-34.

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 3

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    Six days later, on Monday, February 3, 2020, Mr. Holcomb walked into the

2    police department, revoked consent as to all devices, and Det. Kuschnereit was put on

3    notice that "a search warrant will need to be requested to view that data [from Mr.

4    Holcomb's cell phone[7] and Cooler Master computer tower] from this point on." Dkt.

5    35-1 at 42-43. On February 4, 2020, Det. Kuschnereit filed a motion and affidavit for a

6    search warrant of digital devices belonging to Mr. Holcomb. *Id*. at 45-55.

7    Det. Kuschnereit provided an affidavit to Judge Riquelme where JJ described

8    several consensual sexual acts involving Mr. Holcomb and accused Mr. Holcomb of

9    nonconsensual sexual contact. *Id*. at 47-55. JJ is the sole source of evidence, provided

10   to Judge Riquelme, to suggest that Mr. Holcomb violated RCW 9A.44.050. *Id*.

11   Specifically, JJ said Mr. Holcomb "sexually assaulted her by making her 'suck his

12

---

13   [7] As it relates to exceeding the scope of the Riquelme warrant, when Det. Kuschnereit
14   searched Mr. Holcomb's cell phone, he apparently stayed within the time frame that a
     reasonably well trained officer would understand. Specifically, the detective "used the
15   Cellebrite physical analyzer to open the previously downloaded data of HOLCOMB's
     cell phone" and "searched for items of evidentiary value *that were covered under the*
16   *time constraints of [the] search warrant*." Dkt. 35-1 at 58 (emphasis added). The
     detective "located several evidence items which [he] marked with an "evidence" tag.
17   These items included 24 phone calls between HOLCOMB and [JJ] *from 6/1/2019 to*
18   *current*." *Id*. (emphasis added). Additionally, "(t)here was only one text message of
     evidentiary value which was a text from JJ to Holcomb on 1/26/2020 at 1523 hours…."
19   *Id*.

20   The manner in which the detective executed the warrant of the cell phone – within the
21   time constraints – demonstrates that he knowingly and intentionally violated the terms
     of the search warrant when he executed the warrant for the computer with Det. Neufeld
22   and DPA Platter. The search of the cell phone is not only evidence of what should have
     been an appropriate interpretation of the Riquelme warrant for time constraints, but also
23   evidence that law enforcement exceeded the scope for the computer and need to be
24   deterred from interpreting the same time constraint clause in different ways in the
     future. The detectives and DPA Platter knew there were time constraints for searching
25   the cell phone and computer. They stayed within the bounds and scope for the cell
26   phone but chose to ignore the bounds contained in the Riquelme warrant for the
     computer.

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 4

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1  cock,' and he 'stuck his finger in my ass." Dkt. 35-1 at 47. JJ identified a location

2  where the two alleged assaults occurred: "once just after he picked her up while still in

3  the Tri-Cities area and the second time last night at this residence where Holcomb

4  lives." *Id*. Mr. Holcomb and his wife represented that the acts were consensual based on

5  a review of what actually happened on the surveillance video. *Id.* at 53-54.

6  JJ admitted that she had "consensual" sex with Mr. Holcomb on numerous

7  occasions in the past when they dated about 17 years earlier in 2003. *Id.* at 47. As to the

8  incident in the Tri-Cities area, she described a consensual sexual encounter where she

9  had vaginal and anal sex "for approximately 30 minutes" with Mr. Holcomb, followed

10  by both of them showering together. *Id*. at 48. She, however, described a separate

11  incident in the Tri-Cities area where she had sex with him when she "gave in cause I

12  couldn't fight [Mr. Holcomb's requests to have sex again] anymore," and said to him

13  "fine, whatever." *Id*. at 48.

14  Subsequently, when they arrived at Mr. Holcomb's residence, JJ described two

15  additional consensual sexual encounters:

16  They continued talking until about 2030 hours. JJ was emotional and

17  teary-eyed so HOLCOMB gave her a hug and they began to make out,
   and had sex again. This sex occurred on HOLCOMB's bed inside of his

18  bedroom which will be referred to as the "master bedroom" for
   identification purposes. JJ described HOLCOMB'S bedroom as located

19  next to the living room on the right hand side when walking through the
   living room from the front entrance area. HOLCOMB at this time had

20  been wearing a blue and black checkered pajama bottoms and no shirt.
   JJ described the sex they had as HOLCOMB placing his erect penis into

21  her vagina and also having a little bit of anal sex as well. JJ said that the
   sex ended at 2120 hours and she remembers these times specifically

22  because there is a digital clock on a dresser by the bed.

23

24  JJ further described the furniture in HOLCOMB's bedroom as having a
   dresser with a mirror over it which is off to the right hand side when

25  entering the room, two nightstands one on each side of the bed, a second
   dresser over by a closet and a cradle located at the foot of the bed. The

26

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 5

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1
2
3
4

sheets on the bed were a dark blue or black color and JJ did not know the color of the comforter because she said that HOLCOMB flung it off of the bed when they climbed into it. There were also some unusual curved lamps on the nightstand. At the head of the bed were black cloth restraints that were held in place by Velcro. JJ said that HOLCOMB had asked her if he could tie her up using these restraints and she had agreed to do so.

5    Dkt. 35-1 at 48-49.

6

7

8

JJ next reported that she never gave consent to have her photos taken during this encounter, but she did agree to shower with Mr. Holcomb afterward. *Id*. at 48. JJ next described a third incident in the bedroom:

9
10
11
12
13
14
15
16
17

A few minutes into doing this, she started feeling the nausea coming back so she tried to pull her head away from his penis and he kept pushing her head back down "pushing his dick deeper in my mouth." JJ described almost vomiting on HOLCOMB as he did this. JJ also said that HOLCOMB's penis went deep down her throat causing her pain of 7 on a scale of 1-10 with 10 being the most severe pain she's felt in her life. JJ said that she was able to lift her head up enough to tell him that he needed to stop because she was feeling sick and he said something that sounded like "So?" and pushed her back down onto his penis. JJ said that when she tried to pull her head back harder, he pushed harder down on her head. JJ described how as he was doing this he had one hand grabbing her head, and at the same time his other hand reached over and penetrated her anus with one of his fingers.

18
19
20
21
22
23
24

JJ described HOLCOMB's finger penetrating her anus as causing her great pain of 8 on a scale of 1-10 with 10 being the most severe pain she's felt in her life. JJ told Officers that this "…hurt so bad" and also said that "The more I fought, the more determined he was." JJ said that she kept trying to pull her head up off of his penis and did manage to tell him no that she doesn't want to because she was feeling sick on three separate times. JJ said that due to her pulling away, and also by her verbally telling him several times that it was very clear to him that it was not consensual sex. On the third lift of her head, he was somehow able to move his arms away which must have caught him off guard. She then told him "I'm done" and left the room crying.

25    *Id*. at 49-50.

26

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1        The encounters in the bedroom occurred over a short and specific time. "JJ said

2 that all of this happened really fast, but she estimated there was less than a minute

3 between each time she told him 'no' specifically." Dkt. 35-1 at 50.

4        On February 4, 2020, Judge Riquelme gave permission to search for evidence

5 of JJ's accusations in the following locations:

6
7
8

and the evidence of said crime is located at
❖ A black colored Cooler Master custom desktop computer (serial #  RC902XBKKN11130600424)
❖ A silver colored Dell XPS model P54G laptop (serial # 9K1LK32)
❖ A black colored Google Pixel 2 Cell phone (IMEI 357537085579688) & the Cellebrite cell phone data previously
   downloaded from this same device on 1/29/2020
All of these devices are currently secured in temporary evidence at the Burlington Police Department, 311 Cedar Street in
Burlington.

9 Dkt. 41-1.  The warrant authorized a search for:

10
11
12
13
14
15
16

➢ Evidence of communications to or from ████████████ and/or between JOHN HOLCOMB, ████████
   ████████ or ████████████ This communication includes but is not limited to voicemails/audio
   recordings, SMS, MMS, emails, chats, social media posts/online forums, contact lists and call logs from
   June 1, 2019 to current.
➢ Surveillance video or images depicting ████████ or JOHN HOLCOMB and any other
   surveillance video or images from Jan 26th 2020 to current.
➢ Any location data including GPS coordinates from Jan 26th 2020 to current.
➢ User search history from the devices to include but not limited to searched words, items, phrases,
   names, places, or images from Jan 26th 2020 to current.
➢ Files artifacts or information including but not limited to, documents, photographs, videos, e-mails,
   social media posts, chats and internet cache that would show dominion and control for the devices.

17 *Id.*.

18        The warrant commanded that the search occur within 10 days. *Id.* On February

19 20, 2020, six days after the 10-day requirement lapsed, Det. Kuschnereit sent an e-mail

20 to DPA Platter. The e-mail said that a search was conducted on the "sex videos on the

21 computers" and concluded that "(m)any of the details sounds like they match what the

22 victim reported but I'm not sure on whether the sex at the end appeared forcible."

23

24

25

26

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 7

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

| | |
|---|---|
| **From:** | Adrian Kuschnereit </O=BURLINGTON/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=ADRIANK> |
| **Sent:** | Thursday, February 20, 2020 5:16 PM |
| **To:** | 'Branden Platter'          @co.skagit.wa.us> |
| **Subject:** | RE: Holcomb |

Update:

Duane said he was able to find the sex videos on the computers. According to Duane it looks like they arrive together in a minivan, start having sex at 1956 hours, take a break at some point in between and then stop having sex at 2355 hours when he says "I'm done". There is audio too, but it might not be the best quality I guess. Many of the details sounds like they match what the victim reported but I'm not sure on whether the sex at the end appeared forcible.

Duane is going to be back tomorrow at 0915 hrs if you'd like to meet me at the sheriff's office then to check it out with Duane?

Dkt 35-1 at 66.

On February 21, 2020, seven days after the 10-day requirement lapsed, Det. Kuschnereit, DPA Platter, and Det. Duane Neufeld viewed the videos that proved the sex between JJ and Mr. Holcomb was consensual. Det. Kuschnereit wrote "(a)t no point in the video clips that I saw did I observe HOLCOMB appearing to restrain JJ forcibly." *Id*. at 63.

The videos of the alleged rape were found only in the *upper hard drive*, or a container completely separate from the lower hard drive. The upper hard drive "is where the surveillance videos from the security cameras were located." Dkt. 35-3 at 18. The upper hard drive contained 6,824 videos – dated between June 2019 and January 28, 2020 – separated into three folders based on the location of the surveillance cameras. Of the 6,824 videos, just "758 video files met the search warrant scope…." Dkt. 35-3 at 19. "It was straightforward to interpret the filenames…." *Id*. The file names:

> …included the camera the video was created from and the date and time. For example: 3_2020-01-28_02-56-39.mp4 is the bedroom camera, identified by the "3_" and the video dated January 28, 2020 at 2:56 AM. To make it easier to search the video files the examiner can filter by Filename on "3_2020", filter Extension on "mp4", and sort by Filename ascending. Forensic Explorer lists 309 video files in chronological order, making the search and examination much easier.

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 8

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    *Id*. It was obvious that all the video surveillance related to the Riquelme warrant, and

2    alleged probable cause, was located on the upper hard drive because the videos were

3    sorted by name, date, and location.

4         Despite multiple reviews of the video by at least two detectives and one

5    prosecutor, all agreeing no crime occurred, law enforcement decided to continue

6    watching sex videos or processing hard drives that had no nexus to the warrant,

7    affidavit, or alleged probable cause for a rape of JJ. "Detective Neufeld was advised to

8    ***continue processing*** the ***other hard drives*** as per standard procedures and to continue

9    looking for additional surveillance videos or angles that may be present."

10

11

12

13

14

> On 02/21/2020 at 0915 hours I met Detective Duane Neufeld and Prosecutor Branden
> Platter at the Skagit County Sheriff's Office to preview the video evidence in
> this case. Detective Neufeld was still processing the computers and imaging some
> additional hard drives from the desktop but had located several videos of
> HOLCOMB and ☐☐☐☐ having sex together on the night of this incident. Detective
> Neufeld played a few of the videos for us. The last video clip is in black and
> white and ends at 2355 hours when ☐☐☐ stops performing fellatio on HOLCOMB.
> According to ☐☐ this was when the originally consensual sexual encounter
> changed as HOLCOMB held her head down to his penis forcibly. In this video clip
> HOLCOMB can be seen lying on his back on the bed in the master bedroom. ☐☐☐
> is lying down with her right foot against the bed (facing away from the camera)
> on HOLCOMB's left side. I observed that ☐☐☐ does appear to be willingly
> performing oral sex on HOLCOMB. In the camera you can distinctly see HOLCOMB's
> left hand reaching over to touch JUSTICE's butt, while his right hand is resting
> on the upper part of his chest holding a vape device. At no point in the video
> clips that I saw did I observe HOLCOMB appearing to restrain ☐☐☐☐ forcibly.
> Detective Neufeld was advised to continue processing the other hard drives as
> per standard procedures and to continue looking for additional surveillance
> videos or angles that may be present.

15    Dkt. 35-1 at 63 (emphasis added).[8] By asking Det. Neufeld to continue processing the

16    *other* hard drives, all three men knew the search would continue on a hard drive or

17    container that did not have any surveillance video related to the alleged JJ rape.

18    Specifically, the lower hard drive is "where Detective Neufeld located alleged child

19    pornography." Dkt. 35-3 at 12.

20         The lower hard drive could not have contained any evidence related to video

21    surveillance of the alleged rape because all of the files on the lower hard drive were

22    created on or before September 2018. "The most recent user date file on the [lower]

23    hard drive…[was] created 9/4/2018 1:59:17 AM. There are no user data files created

24    after 9/4/2018 1:59:17 AM." *Id*. at 13. There are no folders on the lower hard drive that

25

26

---

[8] This report was not prepared until April 3, 2020, or 43 days after the search occurred.

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 9

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1   have names to connect them to video surveillance. The surveillance videos were

2   automatically saved to the upper hard drive, not the lower hard drive. There are no

3   folders on the lower hard drive that stored video surveillance. Combined, there are no

4   folders on the lower hard drive that contain video surveillance within the time frame of

5   the alleged rape.

6        A search on Forensic Explorer – the same program used by Det. Neufeld –

7   revealed exactly zero files on the lower hard drive within the date range permitted by

8   the warrant. Ex. 1 at 14. Det. Neufeld had Forensics Explorer training and/or possession

9   of the Forensic Explorer training curriculum. The Forensic Explorer training course

10  includes an entire Data Management section with a focus on "filters" and "data and file

11  view internal searching." Ex. 3.

12       About two hours after searching and reviewing the surveillance video from the

13  upper hard drive, and apparently conducting no additional investigation into the rape

14  allegation, Det. Kuschnereit sent an e-mail concluding that "we just located some

15  additional exculpatory evidence so it sounds like the case will be dismissed."

16

| From: | Adrian Kuschnereit <O=BURLINGTON/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=ADRIANK> |
| Sent: | Friday, February 21, 2020 11:19 AM |
| To: | 'Collins, Lisa (WSP)'                    @wsp.wa.gov> |
| Subject: | RE: 20-B00607 |

17

18  Yes, that does make sense. Actually this is very timely because this morning we just located some additional exculpatory evidence
    so it sounds like this case will be dismissed. So please stop all testing except for the required testing of the SAK!

19  If you have any questions feel free to give me a call or email me back. Thank you!

    **Detective Adrian Kuschnereit**
20  Burlington Police Department
    311 Cedar St. Suite B
    Burlington WA, 98233

21  Dkt. 35-1 at 70.

22       The observations and opinions that there was no forcible compulsion corroborate

23  Mr. Holcomb's protestations of innocence that were provided to Judge Riquelme in the

24  affidavit:

25       HOLCOMB said that he only knows that he did have sex because JILL
26       had reviewed the video surveillance on his desktop computer which

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 10

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

**FER-12**

showed them doing so. HOLCOMB said that JILL told him after watching the video that JJ was pushing him to have sex with him and at one point while having sex, was "riding him."

Dkt. 35-1 at 53-54.

On April 3, 2020, more than a month after the JJ rape case against Mr. Holcomb was dismissed (Dkt. 41-2), the affiant prepared a supplemental narrative. Dkt. 35-1 at 69. In this report, the affiant stated that on February 21, 2020, seven days after the warrant had expired, he received a call that child pornography was found on Mr. Holcomb's computer. *Id*. The government takes the position that this is the moment when evidence related to child pornography, dating back to 2015, is discovered. Dkt. 41 at 6. The government does not identify where, or on which hard drive, the evidence was discovered. No contemporaneous records are provided to understand the circumstances of this discovery. An evidentiary hearing is necessary to establish whether the search occurred after February 21, 2020, and the circumstances surrounding it.[9]

**A. Under the totality of the circumstances, the Riquelme warrant application does not establish that Mr. Holcomb engaged in sexual intercourse by forcible compulsion with JJ.**

The government argues that probable cause existed because the Fourth Amendment "does not require police or judges to believe a target's self-serving claims." Dkt. 41 at 12. The "totality of the circumstances" approach is "highly relevant"

---

[9] Mr. Holcomb advises the Court that DPA Platter is a witness in this case. He was present when the surveillance videos were viewed. It is unclear who advised the officers to continue to search the computer. No procedural protocols have been disclosed allowing such a search. The government appears to defend the search citing to DPA Platter's involvement. Mr. Holcomb has further been advised that Det. Kuschnereit no long works with the Burlington Police Department and the circumstances surrounding his departure have not been disclosed despite requests. The government has informed Mr. Holcomb that it does not believe Det. Kuschnereit is continuing a career in law enforcement.

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 11

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1   in determining veracity, reliability, and the basis of knowledge of an accusing witness.

2   *Illinois v. Gates*, 462 U.S. 213, 230 (1983). Probable cause must turn on facts, not

3   conclusions: "(c)onclusions of the affiant unsupported by underlying facts cannot be

4   used to establish probable cause…An affidavit must recite underlying facts so that the

5   issuing judge can draw his or her own reasonable inferences and conclusions: it is these

6   facts that form the central basis of the probable cause determination." *United States v.*

7   *Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013). None of the cases cited by the

8   government involves an accusation of sexual assault.[10]

9        "Law enforcement officers may obviously rely on statements made by the

10  [alleged] victim[] of a [sexual assault] to identify suspects. But such information does

11  not, on its own, support a finding of probable cause if the information is not reasonably

12  trustworthy or reliable." *Stoot v. City of Everett*, 582 F.3d 910, 919 (9th Cir. 2009).

13  Applying this principle, a higher court rejected a finding of probable cause by a lower

14  court when the accuser told inconsistent stories and the officers were unable to

15  corroborate any aspect of the alleged abuse. *Wesley v. Campbell*, 779 F.3d 421, 431-

16  433 (6th Cir. 2015). In contrast, a higher court found probable cause when "[a]side

17  from [the accused's] own protestations of innocence and his claims that the [sexual

18  assault] allegations against him had been fabricated by the alleged victim for reasons of

19  jealously, he has identified no independent reason the police officer might have doubted

20  her credibility." *Johnson v. District of Columbia*, 927 F.3d 539, 547–48 (D.C. Cir.

21  2019).

22

23

---

24  [10] There was no evidence that Mr. Holcomb visited child pornography websites or was a
    member of such sites (*United States v. Gourde*, 440 F.3d 1065 (9th Cir. 2006)), used

25  the e-mail systems to receive and distribute such photos (*United States v. Kelley*, 482

26  F.3d 1047 (9th Cir. 2007)), or discussed his sexual dispositions on social media (*United States v. Flores*, 802 F.3d 1028 (9th Cir. 2015)).

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 12

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1      There are multiple reasons to doubt JJ's credibility, even affording deference to

2  Judge Riquelme. JJ did not call 911 or the police to report an assault. The accusation

3  was leveled when ***Mr. Holcomb called the police*** after JJ refused to leave his residence.

4  Dkt. 35-1 at 50. JJ accused Mr. Holcomb of sexual assault against the backdrop of

5  admissions that she engaged in similar acts consensually.

6      The assault accusation must be considered in light of Mr. Holcomb and his

7  wife's representations to the officers that the acts were consensual based on a review of

8  the documentary evidence. Mr. Holcomb offered to show this evidence, the surveillance

9  video, to law enforcement. Dkt. 35-1 at 27 (Mr. Holcomb signed a consent to search

10  form and then "wanted to view the surveillance footage from his bedroom with [law

11  enforcement]. [Mr. Holcomb] advised Jill had viewed the recordings of [Mr. Holcomb]

12  and [JJ] having sex and he wanted [law enforcement] to view them because the video

13  would provide his innocence…[Mr. Holcomb] advised Jill told him [JJ] was the one

14  pushing to have sex and [JJ] was seen riding [Mr. Holcomb]. [Mr. Holcomb] continued

15  to insist that [Mr. Holcomb and law enforcement] watch the video….[Mr. Holcomb]

16  advised…that the sex videos started around 7pm on 1/27/20" and "Jill viewed the

17  footage so there should be a little blue check mark next to the videos.").

18      Mr. Holcomb's wife had no self-serving interest to exculpate her husband. She

19  "seemed upset by what occurred." *Id*. at 40. She cooperated with police by showing

20  them text messages between her and Mr. Holcomb. *Id*. at 39. She told the police that

21  she "reviewed the surveillance system, and found video evidence of Holcomb and JJ

22  having sex in their bed in the bedroom." *Id*. at 40. She told law enforcement that Mr.

23  Holcomb and JJ had consensual sex in multiple positions, based on her review of the

24  video surveillance. *Id*.

25      On these facts, probable cause did not exist to search Mr. Holcomb's devices in

26  their entirety, as argued by the government, for evidence related to forcible compulsion

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 13

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1   in violation of RCW 9A.44.050(1)(a). This is particularly true because JJ, Mr.

2   Holcomb, and Jill were specific as to when, where, and how the alleged assault

3   occurred. The officers, including the deputy prosecuting attorney, corroborated Mr.

4   Holcomb's version of the events when they viewed videos exculpating him of the

5   accusation. JJ made a false accusation and everyone knew it. But, at some point after

6   that discovery, law enforcement continued to search all the devices. The Court,

7   respectfully, should suppress all the evidence because probable cause was lacking.

> **III.** **Even if probable cause existed to issue the warrant, the category of the Riquleme warrant, which read "Files artifacts or information including but not limited to, documents, photographs, videos, e-mails, social media posts, chats and internet cache that would show dominion and control of the devices," along with the other categories, are overly broad.**

Against the backdrop of the facts described above, the Riquelme warrant allowed officers to search for five categories of digital evidence in broad terms. Ever since the Supreme Court stated that there are "substantial privacy interests…at stake when digital data is involved," *Riley v. California*, 573 U.S. 373, 375 (2014), courts have discussed the need to protect that privacy.[11] As explained in Mr. Holcomb's

---

[11] See, e.g., *United States v. Galpin*, 720 F.3d 436, 447 (2nd Cir. 2013) (discussing the need for "heightened sensitivity to the particularity requirement in the context of digital searches" due to the vast amount of information that digital devices contain); *United States v. Comprehensive Drug Testing, Inc*., 621 F.3d 1162, 1176 (9th Cir. 2010) (discussing the "serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant"); *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009) (ability of a computer to store "a huge array" of information "makes the particularity requirement that much more important"); *United States v. Carey*, 172 F.3d 1268, 1275 n.7 (10th Cir. 1999) (discussing the court's "belief that the storage capacity of computers requires a special approach" to particularity and the execution of searches of digital media); *Wheeler v. State*, 135 A.3d 282, 307 (Del. 2016) (risk for warrants for digital and electronic devices to become "general warrants" is substantial, which "necessitates heightened vigilance, at the outset, on the part of judicial officers to guard against unjustified invasions of privacy"); *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, 77-78,

1  opening motion to suppress, the Honorable James P. Donohue did so long before *Riley*.

2  Dkt. 35 at 32.

3      Courts have also recognized the need for ex ante protections when police seize

4  large caches of private digital data, without probable cause or particularity, to prevent

5  them from exploiting this information. *See, e.g., CDT Inc.*, 621 F.3d 1162 (9th Cir.

6  2010) (per curiam) (en banc); *id.* at 1180 (Kozinski, C.J., concurring); *In re Search*

7  *Warrant*, 71 A.3d 1158 (Vt. 2012); *State v. Mansor*, 421 P.3d 323 (Or. 2018). This

8  Circuit has approved a "seize first, search second" methodology where the government

9  can "demonstrate…factually why such a broad search and seizure authority is

10 reasonable *in the case at hand.*" *United States v. Hill*, 459 F.3d 966, 975 (9th Cir.

11 2006) (emphasis added.)

12     There are two conflicting factual reasons provided to justify the search at issue.

13 Law enforcement represents that they conducted the search "to continue processing the

14 other hard drives as per standard procedure and to continue looking for additional

15 surveillance videos or angles that may be present." Dkt. 35-1 at 63. The government has

16 abandoned that justification, focusing on one provision in the warrant – the dominion

17 and control clause. Dkt. 41 at 13-16. That provision purportedly allowed officers to

18 search the computer for "(f)iles artifacts or information including but not limited to,

19 documents, photographs, videos, e-mails, social media posts, chats and internet cache

---

20 46 N.E.3d 638 (2015) (due to the large amount of information on computers, officers

21 must be clear about what they are "seeking on the computer and conduct the search in a

22 way that avoids searching files of types not identified in the warrant") (emphasis added

and citing *United States v. Walser*, 275 F.3d 981, 986 (10th Cir. 2001); *People v.*

23 *Herrera*, 2015 CO 60 (2015) (in executing a search warrant for evidence related to a

suspected crime involving a particular victim, it violates the Fourth Amendment for law

24 enforcement officers to open a file labeled with the name of a different possible victim

even where the suspected crime was the same); see also Orin S. Kerr, *Searches and*

25 *Seizures in a Digital World*, 119 Harv. L. Rev. 531, 565 (2005) (explaining that without

26 careful attention to particularity, "today's diminished protections are likely to shrink

even more as technology advances").

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 15

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1   that would show dominion an control of the devices" Dkt. 41-1. The government argues

2   that the provision allowed the search of all devices, in their entirety, to obtain evidence

3   of dominion and control in the event Mr. Holcomb disputed the same at trial.

4          But because the affidavit is incorporated in the warrant, the Court evaluates that

5   justification looking at "the affidavit and the warrant as a whole." *United States v. SDI*

6   *Health Inc.*, 568 F.3d 684, 699 (9th Cir. 2009). An affidavit is incorporated when the

7   warrant uses "suitable words" referring to the affidavit. *Id.* Here, the Riquelme warrant

8   incorporated the affidavit: "Detective Adrian Kuschnereit has this day signed an

9   affidavit on oath before the undersigned, Laura M. Riquelma Judge, Skagit County

10  Superior Court, that he believes that a crime has been or is being committed." Dkt. 41-1

11  at 2; *see United States v. Vesikuru,* 314 F.3d 1116, 1120 (9th Cir.2002) (holding that

12  "[u]pon the sworn complaint made before me there is probable cause to believe that the

13  [given] crime[ ] ... has been committed" are suitable words of reference.)

14         "[An incorporated] warrant must not only give clear instructions to a search

15  team, it must also give, that is, not overbroad instructions." *SDI Health Inc.*, 568 F.3d at

16  702. In *SDI*, the Court invalidated five categories of a warrant similar to the one at issue

17  here:

18         9. Documents relating to non-privileged internal memoranda and E-mail.

19         10. Documents relating to bank accounts, brokerage accounts, trusts.

20         11. Checking, savings, and money market account records, including check

21         registers, cancelled checks, monthly statements, wire transfers, and cashier's

22         checks.

23         12. Documents relating to personnel and payroll records.

24         24. Rolodexes, address books and calendars.

25  *Id.* at 704.

26

1    *SDI* explained that these five categories did not attempt to limit the search. *Id.* at

2    704. In fact, as to Category 24, the Court called its characterization "the laziest of

3    gestures in the direction of specificity" because this category "practically begs the

4    search team to find and seize the contact information of every person who ever dealt

5    with SDI." *Id.* at 705. Here, like the provisions in *SDI*, all five categories, including the

6    dominion and control category, begged the search team to find and seize anything and

7    everything. The provisions gave license to the officers to search broadly for (f)iles

8    artifacts or information including but not limited to, documents, photographs, videos,

9    e-mails, social media posts, chats and internet cache."  Dkt. 41-1.

10   Because the government cannot distinguish *SDI* or provide precedent to the

11   contrary, it must concede that the warrant gave "authority to look at all the videos on

12   the computer" (Dkt. 41 at 14) and everything else too. "(T)he warrant authorized the

13   police to search the entire computer." *Id.* at 23. Naturally, in defending that authority,

14   the government points to the prospect that Mr. Holcomb would "someday contest

15   dominion and control" as to possession of the computer and the files associated with it.

16   Dkt. 41 at 26. There are multiple fallacies with the government's justification.

17   Law enforcement *actually* searched the lower hard drive for so-called processing

18   purposes, even though it could not contain any item related to the rape allegation

19   because it did not have any file after September 2018. The search of the lower hard

20   drive occurred after exculpatory and exonerating evidence was discovered on the upper

21   hard drive.

22   All the while, the incorporated affidavit and the warrant made clear that

23   dominion and control was not contested: "HOLCOMB encouraged Detectives to watch

24   the video surveillance and even provided Detectives with the passcode for his desktop

25   computer." Dkt. 35-1 at 54. He gave consent to search the computer and later withdrew

26   that consent. He told law enforcement that he wanted his computer searched for the

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 17

1  relevant surveillance video to prove the rape did not occur. Probable cause is measured

2  from the "facts known" to the officers. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

3  No facts were available to the officers to suggest that Mr. Holcomb would contest

4  dominion and control at some point in the future.[12]

5      The other categories fail for the same reasons the dominion and control category

6  fails because, although they provide some temporal limitation, they place no restriction

7  as to what may be searched or seized and they are not tied to seeking evidence of a

8  crime. The Court should suppress all the evidence seized.

9  **IV.   Even if probable cause existed to issue the warrant, the**
10  **provision of the Riquleme warrant that read "Files artifacts or**
11  **information including but not limited to, documents,**
      **photographs, videos, e-mails, social media posts, chats and**
12  **internet cache that would show dominion and control of the**
      **devices," along with the other provisions, fail because they are**
13  **not particular.**

14      The government, in error, states that the recently produced Riquelme warrant did

15  not contain the "including, but not limited to" language. Dkt. 41 at 24. The warrant

16  clearly shows that it does. Dkt. 41-1 at 3.

17      None of the cases cited by the government save the warrant. In *United States v.*

18  *Banks*, 556 F.3d 967, 973 (9th Cir. 2009), the Court rejected that the warrant's "lack of

19  a time frame rendered it insufficiently particular…because the record and affidavit do

20  not demonstrate the knowledge on the part of the government that the illegal conduct

21

22

---

23  [12] A view of the procedural history in this case proves that Mr. Holcomb has never
24  contested the computer belonged to him. He has now filed three motions to suppress in
     three different jurisdictions, each claiming the computer belonged to him. He has even
25  filed motions to either return or destroy his computer. Ex. 4. The government's position
     that Mr. Holcomb or his attorneys would ever argue the computer belonged to anyone
26  but Mr. Holcomb is not based in reality.

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 18

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    was limited to any particular time frame."[13] Here, the affidavit demonstrates that the

2    government knew that the accusation was limited to a particular period of

3    approximately five hours on a single night. Indeed, there was some temporal limitation

4    provided with the first four categories of evidence, suggesting that Judge Riquelme

5    placed those limitations for that very reason. Det. Kuschnereit's review of Mr.

6    Holcomb's cell phone, which connected the search to the appropriate time limitation

7    contained in that warrant, adds support to law enforcement's knowledge that the

8    warrant created time restrictions. But Judge Riquelme's temporal limitations were

9    ignored because, as the government admits, the evidence seized from the lower hard

10   drive dated back to "2015." Dkt. 41 at 2.

11          Contrary to the government's claim, this case does not involve one of the

12   circumstances where the "including, but not limited to" language is permissible because

13   the provision allowed officers to search and seize items related to a specific crime or

14   type of criminal activity. In *United States v. Reeves*, 1999 WL 33614049 *19

15   (Appellate Brief) (9th Cir. 1999), the objected to provision read: "may include, but is

16   not limited to…other items related to the manufacturing and distribution of controlled

17   substances, in particular, methamphetamine." The Court found the language

18   permissible. *See United States v. Reeves*, 210 F.3d 1041, 1046 (9th Cir. 2000).

19          In *United States v. Washington*, 797 F.2d 1461, 1472 (9th Cir.1986), the Court

20   found permissible a provision that allowed search and seizure of "records, notes, [and]

21   documents indicating [the defendant's] involvement and control of prostitution activity

22   including but not limited to, photographs, handwritten notes, ledger books," because the

23   warrant "effectively tells the officers to seize only items indicating prostitution

24   activity." Additionally, in *United States v. Shi*, 525 F.3d 709, 731 (9th Cir. 2008), the

25

26   [13] *United States v. Brobst*, 558 F.3d 982, 993 (9th Cir. 2009), did not address the issue
     of breadth or particularity.

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 19

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

1   words "including, but not limited to" did not make a warrant insufficiently particular
2   because it authorized a search of only the limited area the defendant inhabited. The five
3   categories in Mr. Holcomb's case did no such thing.

4        Here, "[b]y failing to describe with any particularity the items to be seized, the
5   warrant is indistinguishable from the general warrants repeatedly held…to be
6   unconstitutional." *United States v. Kow*, 58 F.3d 423, 426 (9th Cir. 1995). And no
7   precedential justification is provided to the Court.

8        Particularity makes certain that officers executing the warrant are able to
9   identify, from the face of the warrant and any attached or expressly incorporated
10  documents, what it is that they are being asked to search and seize. *United States v.*
11  *Bridges*, 344 F.3d 1010, 1017 (9th Cir. 2003). A warrant satisfies the particularity
12  requirement if it clearly states with reasonable specificity what has to be seized or, if
13  any such designation is impossible, at least specifies the suspected criminal conduct and
14  limits the evidence sought to items associated with that conduct. *See Kow*, 58 F.3d at
15  427.

16       On the one hand, the warrant need not be "elaborately detailed, and the
17  specificity required varies depending on the circumstances of the case and the type of
18  items involved." *United States v. Rude*, 88 F.3d 1538, 1551 (9th Cir. 1996). On the
19  other hand, generic classifications in a search warrant are acceptable "only when a more
20  precise description is not possible." *Kow*, 58 F.3d at 427. In the latter situation, the
21  scope of the seizure can be limited by such objective criteria as (1) suspected criminal
22  conduct and (2) a time frame within which that conduct occurred, both of which were
23  known to the officers. *Id.* However, generic references to violations of a certain
24  criminal statute, without more, are insufficient to make the description of the evidence
25  sought particular. *See United States v. Cardwell*, 680 F.2d 75-77 (9th Cir. 1982)

26

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 20

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

1  (finding provision that contained "including but not limited to" language overbroad

2  even when tied to "violations of 26 U.S.C. s 7201.")

3        Even if the Court finds that JJ's accusations provided probable cause to conduct

4  a search, the suspected criminal conduct – sexual assault by forcible compulsion – was

5  alleged to have occurred over a brief period on a specified date known to the officers.

6  No reasonable effort is made to justify such a broad search under the circumstances in

7  the face of "exculpatory" evidence that directly refuted JJ's accusation.

8        Like the dominion and control category, the other categories of the Riquelme

9  warrant suffer from the same problems, even though they contained some temporal

10  limitation. Dkt. 41-1 at 3 ("This communication includes but is not limited to…,"

11  "…any other surveillance video or images…," "(a)ny location data…," "[u]ser search

12  history from the devices to include but not limited to…."). Here, like *Bridges*, 344 F.3d

13  at 1018, "it is unclear what is [the warrant's] precise scope or what exactly it is that the

14  [officers] are expected to be looking for during the search." This is particularly true

15  because the provisions are not tied to evidence of a sexual assault that allegedly

16  occurred during a limited and known time. The Riquelme warrant fails for lack of

17  particularity.

18
19     **V.**    **Because the Riquelme warrant is a general warrant, the Court**
               **respectfully, must invalidate it.**

20     "Suppression helps ensure that law enforcement personnel adhere to

21  constitutional norms[.]" *Comprehensive Drug Testing, Inc*., 621 F.3d at 1173. The good

22  faith exception to the exclusionary rule does not apply when the warrant is "so facially

23  overbroad as to preclude reasonable reliance by the executing officers." *United States v.*

24  *Michaelian*, 803 F.2d 1042, 1046 (9th Cir. 1986). The good faith exception does not

25  apply to a warrant and affidavit that plainly fails to show probable cause. *See United*

26  *States v. Underwood*, 725 F.3d 1076, 1086 (9th Cir. 2013). The good faith exception

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 21

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    forbids a police officer from relying on an error of his own making. *Groh v. Ramirez*,

2    540 U.S. 551, 564 (2004).

3        This is an abnormal case where the officers, in effect, conducted a warrantless

4    search. *Cardwell*, 680 F.2d 75-79 (9th Cir.1982) ("In this case even the most specific

5    descriptions…are fairly general."); *United States v. Spilotro*, 800 F.2d 959, 964-965

6    (9th Cir.1986) (noting that "the government could have narrowed most of the

7    descriptions in the warrant[ ]" and expressly relying on the conclusion that "the

8    descriptions found deficient in *Cardwell* were at least as precise as the descriptions at

9    issue here"); *Kow*, 58 F.3d at 427 ("By failing to describe with any particularity the

10   items to be seized, the warrant is indistinguishable from the general warrants repeatedly

11   held by this court to be unconstitutional."). Here, a prosecuting attorney was one of the

12   executing officers. DPA Platter helped execute the warrant and determined that

13   probable cause for the alleged rape of JJ no longer existed.

14       Invoking good faith, the government argues it was "objectively reasonable for

15   the police [and a prosecuting attorney] to rely on the validity of the computer search

16   warrant after [Judge Riquelme] issued it." Dkt. 41 at 27. Good faith provides "an

17   exception to the exclusionary rule for a search conducted in good faith reliance upon an

18   objectively reasonable search warrant." *SDI Health Inc.*, 568 F.3d at 706. For the

19   exception to the exclusionary rule to apply, the executing officers – in this case two

20   detectives and a prosecuting attorney – needed to act "in objectively reasonable reliance

21   on the issuing magistrate's finding of probable cause." *United States v. Leon*, 468 U.S.

22   897, 922 (1984).

23       The government concedes that the Riquelme warrant "was granted…to search

24   this desktop computer for evidence *related to the rape investigation*." Dkt. 41 at 5

25   (emphasis added). This concession, alone, requires suppression of the evidence. Once

26   the two detectives and the prosecuting attorney watched the surveillance video, they

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 22

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1   concluded that JJ was lying and a rape did not occur. Dkt. 41 at 6. In its response, the

2   government again concedes that JJ was lying and a rape did not occur. *Id*. ("However,

3   there was *no evidence* in the video that Holcomb used compulsion or restrained J.J.")

4   (emphasis added). Yet, the government argues that "nothing about how the police

5   executed the warrant justifies a conclusion that [law enforcement] exceeded its scope

6   when the[y] discovered the videos." Dkt. 41 at 9.

7        Admitting that there was no evidence of the alleged rape, the government argues

8   that law enforcement was permitted to search a completely different hard drive – with

9   zero files on it subsequent to September 2018. But that search was no longer related to

10  the rape investigation. The government argues that this search was permitted – after

11  probable cause disappeared – because the "dominion-and-control evidence had no

12  temporal limitation." *Id*. And the government makes this argument even though it

13  concedes that the "circumstances of the search" aid in the determination of whether a

14  search exceeds the scope of a warrant. *Id*. at 13.

15       The government concedes it was apparent that no crime was committed but

16  ignores the circumstances of the search in its analysis. There was only one surveillance

17  camera inside the home. All the surveillance video of JJ was located on the upper hard

18  drive. Not one single file on the lower hard drive was from a date after September 2018.

19  The circumstances of the search prove law enforcement exceeded the scope of the

20  warrant. The government contradicts its position that the warrant authorized a search

21  "for evidence related to the rape investigation." *Id*.

22       The detectives and DPA Platter knew their search was outside the scope of the

23  warrant. Det. Kuschnereit knew the warrant had temporal limitations based on how he

24  searched the cell phone because his search did not stray into dates earlier than June

25  2019. He stayed within temporal limitations when he searched the cell phone. But when

26  law enforcement continued its search of the computer hard drives, after watching the

1   video that exonerated Mr. Holcomb, they knew the search was outside the scope. The

2   government's conclusion (that the officers did not exceed the scope of the warrant) does

3   not fit the very facts ((1) that the search of the computer was for evidence related to a

4   rape and (2) that there was no evidence of a rape) it concedes.

5        Even if the warrant on its face incorporates the affidavit, to rely on the exception

6   "the government must show that the officers who executed the search *actually relied on*

7   *the affidavit*." *SDI Health Inc.,* 568 F.3d at 706 (emphasis added). The government

8   makes no such attempt. An evidentiary hearing is necessary to resolve the issue.

9        The warrant's search provisions are "so facially deficient" for lack of

10  particularity and breadth that no executing officer could reasonably presume them to be

11  valid. *See Leon*, 468 U.S. at 922-923 (1984). In failing to provide the officers sufficient

12  time and scope limitations as to the fifth category of evidence, the issuing judge

13  "wholly abandon[ed] his or her judicial role." *Id.* The same is true as to the other

14  provisions because they are not tied to the investigation of a crime or limited in any

15  substantive manner.

16       This case does not involve a technical violation of the knock-and-announce rule

17  (*Hudson v. Michigan*, 547 U.S. 586, 591 (2006)), a mistaken interpretation of appellate

18  law (*Davis v. United States*, 564 U.S. 229, 236–37 (2011)), or a computer error in a

19  warrant system caused by the negligence of a third party (*Herring v. United States*, 555

20  U.S. 135, 147–48 (2009)). The officers (1) searched the computer looking at files dating

21  back to 2015 on a completely separate hard drive that did not have any files after

22  September 2018, (2) viewed video and images of Mr. Holcomb and his wife engaged in

23  intimate acts, (3) did so on an expired warrant, and (4) did so after looking at evidence

24  exculpating Mr. Holcomb of the accusations leveled against him by JJ. They held on to

25  the computer even though Mr. Holcomb told them he needed the computer back

26  because it contained sensitive financial records for his upcoming tax filing.

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL) - 24

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    The government erroneously argues that state law has no relevance to the Fourth
2  Amendment analysis. Dkt. 41 at 2.; *United States v. Mota*, 982 F.2d 1384, 1388 (9th
3  Cir. 1993) (district courts can look to state law in assessing the legality of a search or
4  seizure); *United States v. Artis*, 919 F.3d 1123, 1130 (9th Cir. 2019) (looking to state
5  law and procedure to determine whether warrants violated the Fourth Amendment.) No
6  state precedent or procedure is cited where such a search was conducted by state agents.
7  It is reasonable to infer that this case, involving such a serious accusation, was
8  dismissed before the state filed an opposition to Mr. Holcomb's motion to suppress
9  because the search was in direct violation of the Fourth Amendment.

10    The government's good faith argument fails under Washington state law. The
11  government may not rely on a good faith exception to the exclusionary rule because one
12  does not exist in Washington. *State v. Betancourth*, 190 Wash.2d 357, 366 (2018) ("It is
13  well established that article I, section 7 [of the Constitution of the State of Washington]
14  provides greater protection to individual privacy rights than the Fourth Amendment"
15  and "because the paramount concern of our state's exclusionary rule is protecting an
16  individual's right of privacy, we have explicitly declined to adopt a good faith or
17  reasonableness exception to the exclusionary rule under article I, section 7."); *State v.*
18  *Werner*, 79 Wash.App 872, 883 (1995) ("The United States Supreme Court has adopted
19  a "good faith" exception to the exclusionary rule. The Washington Supreme Court has
20  not.").

21    Also, under Washington law, a search on an expired warrant under the
22  circumstances is allowed if: (1) probable cause existed throughout the search, (2) it
23  does not create unfair prejudice to the defendant, or (3) the officers did not act in bad
24  faith. *State v. Grenning*, 142 Wash. App. 518, 525–35 (2008), aff'd, 169 Wash. 2d 47
25  (2010) (citations omitted, footnotes omitted). The timing requirement under state law is
26  established by rule. "A search warrant…shall command the officer to search, within a

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 25

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

FER-27

1   specified period of time not to exceed 10 days, the person, place, or thing named…."

2   CrR. 2.3(c) (emphasis added). In *United States v. Jennen*, 596 F.3d 594, 600 (2010), the

3   Court held that a warrant executed six days after it was issued did not violate the rule

4   because the "facts underlying the magistrate's determination of probable cause" did not

5   "material[ly] change" and there was no need for police to confer with a judicial officer

6   to see if "probable cause still exist[ed]."[14]

7         Here, probable cause did not exist through the search. Probable cause ceased to

8   exist upon the viewing of the surveillance video. Everyone who watched the video –

9   DPA Platter, Det. Kuschnereit, Det. Neufeld, and Mr. Holcomb's wife – knew that JJ

10  lied when she reported that Mr. Holcomb raped her. In fact, law enforcement did not

11  even bother to re-interview JJ after they watched the video, to get her take or analysis of

12  what happened, because it was so apparent she lied about being raped.

13        Rather than return to the judge to ask for permission to keep searching, the

14  officers continued to search a completely different hard drive that could not have

15  contained evidence of the rape alleged by JJ. The officers did not continue the search in

16  connection with any crime at all. Instead, the officers searched a completely different

17  hard drive for "processing" purposes, going back in time to 2015. An evidentiary

18  hearing is necessary to address prejudice and the issue of bad faith.

19      **VI.**    **Conclusion**

20       The Honorable John C. Coughenour has stated:

21
22        Child pornography is an invidious blight on our society and endangers
          those who most need our protection. Rarely will there be a set of facts
23        more tempting to counsel embracing a legal fiction and ensure the ends
          justify the means. Collectors and purveyors of child pornography should
24        and must be pursued and investigated aggressively—and no doubt that is

25  [14] Abrogated on other grounds by *Descamps v. United States*, 570 U.S. 254 (2013), and

26  *Mathis v. United States*, 136 S. Ct. 2243 (2016), as recognized in *United States v. Slade*,
    873 F.3d 712, 713 (9th Cir. 2017).

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 26

1
2
3
4

what the law enforcement officers here were doing. But such pursuit must also be within the limits of our Constitution, lest governmental overreach be justified in lockstep with the severity of the alleged offense. And while endorsement of law enforcement's actions here would appear to benefit society—and admittedly it would—the long term viability of our Constitution demands more, and it depends on sometimes wholly unsatisfactory decisions such as this.

5
6
7

*United States v. Pippin*, 2017 WL 1737666 (W.D. Wash. May 2, 2017) *6, reversed on reconsideration in *United States v. Pippin*, 2017 WL 2806805 (W.D. Wash. June 29, 2017).

8
9

 Mr. Holcomb requests that the Court suppress all evidence including the fruits of evidence at issue in this case.

10

 DATED this 8th day of April 2022.

11

        Respectfully submitted,

12
13
14

       s/ *Mohammad Ali Hamoudi*
       s/ *Gregory Geist*
       Assistant Federal Public Defenders
       Attorneys for John Holcomb

15
16
17
18
19
20
21
22
23
24
25
26

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 27

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

May 11, 2022 - 1

1     UNITED STATES DISTRICT COURT

2     WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3     _____

4                              )
      UNITED STATES OF AMERICA,  ) CR21-75-RSL

5                              )
                 Plaintiff,    ) SEATTLE, WASHINGTON

6                              )
      v.                       ) May 11, 2022

7                              )
      JOHN HOLCOMB,            ) 10:00 a.m.

8                              )
                 Defendant.    ) Motion to Suppress

9
10    _____

11          VERBATIM REPORT OF PROCEEDINGS
      BEFORE THE HONORABLE ROBERT S. LASNIK
12          UNITED STATES DISTRICT JUDGE

12    _____

13

14    APPEARANCES:

15

16

17    For the Plaintiff:     Matthew Hampton
                             Assistant United States Attorney
18                           700 Stewart Street
                             Suite 5220
19                           Seattle, WA 98101

20    For the Defendant:     Mohammad Hamoudi
21                           Gregory Geist
                             Federal Defender's Office
22                           1601 5th Avenue
                             Suite 700
23                           Seattle, WA 98101

24

25

May 11, 2022 - 2

```
 1            THE CLERK:  This is the matter of United States
 2    versus John Holcomb, CR21-75.  Will counsel for the
 3    government, then defense, please make your appearances for
 4    the record?
 5            MR. HAMPTON:  Good morning, Your Honor.  Matt Hampton
 6    for the government.
 7            THE COURT:  All right, Mr. Hampton made his
 8    appearance.
 9            MR. GEIST:  Greg Geist and Mohammed Hamoudi for
10    Mr. Holcomb, appearing by video.
11            THE COURT:  Mr. Holcomb filled out a waiver of
12    in-person for purposes of this hearing, correct, Mr. Geist
13    and Mr. Hamoudi?
14            MR. GEIST:  Yes, Your Honor.
15            THE COURT:  So, Mr. Holcomb, can you hear us okay?
16            THE DEFENDANT:  Yes I can, Your Honor.
17            THE COURT:  Okay.  So we're going to proceed with the
18    motion to dismiss -- or suppress, excuse me.
19        Let me start out by saying that I've granted all the
20    motions regarding the lengths of briefs, and they have been
21    considered.  And I did read the amicus brief from the ACLU.
22        You know, my reaction to the case was, if I saw this on a
23    criminal procedure final exam, I would say there's a
24    professor who is totally out of touch with the real world.
25    But here we are.  And although I think that the behavior of
```

**FER-31**

May 11, 2022 - 3

```
 1    Mr. Holcomb, his fiance' Jill, and JJ, is absolutely
 2    abominable and pathetic, I don't let any of that interfere or
 3    affect my ability to deal with the lofty constitutional
 4    issues that we have here.
 5         So the way I would like to proceed, though, is I think
 6    that I'd like to hear from Mr. Hampton, on the government's
 7    argument regarding the validity of the search warrant,
 8    particularly the dominion-and-control section being unlimited
 9    in time and location; the good-faith exception under Leon,
10    and the deterrence outweighed by substantial societal costs;
11    and then give the defense an opportunity to respond to those,
12    and, if necessary, raise any other ones.  And then we'll see
13    where we go from there.
14         So, Mr. Hampton, about 20 minutes.  Okay?
15              MR. HAMPTON:  Okay, Your Honor.
16              THE COURT:  All right.  Go ahead.
17              MR. HAMPTON:  Your Honor, this is a first
18    principle --
19              THE COURT:  We're having a little trouble hearing
20    you.  I wonder if you could raise the volume or get closer.
21              MR. HAMPTON:  Is that better?
22              THE COURT:  It's still kind of sketchy.  Greg and Mo,
23    are you having trouble hearing too?
24              MR. GEIST:  Yes, Your Honor.
25              MR. HAMOUDI:  Yes, Your Honor.
```

May 11, 2022 - 4

```
1              MR. HAMPTON:  I can move it closer.  Does that
2    improve things?
3              THE COURT:  Not really.
4              MR. HAMPTON:  Okay.
5         Perhaps, Your Honor, I could call in with the audio.
6              THE COURT:  Now you sound great.
7              MR. HAMPTON:  Okay.
8              THE COURT:  Go right ahead.
9              MR. HAMPTON:  As the court is well aware, the
10   touchstone of the Fourth Amendment is reasonableness.  The
11   government here is not advocating for how all searches should
12   be conducted, how all computer searches could be conducted.
13   I'm not asking the court to embrace fraud or sweeping
14   policies about how these searches happen.  What the
15   government is urging the court to do is apply the warrant as
16   it was written.  And as it was written, a judge who had the
17   opportunity to review the affidavit, to assess probable cause
18   and to determine what the appropriate limitations of this
19   warrant would be, concluded that among the things law
20   enforcement were allowed to search for, were evidence of
21   dominion and control, including photos and videos.
22        I think there can be no serious dispute that photos and
23   videos are or can be evidence of dominion and control.  I
24   think there can also be no serious dispute that law
25   enforcement can't be expected to find videos and photos that
```

**FER-33**

May 11, 2022 - 5

1   evidence dominion and control, without examining all of the

2   photos and videos that are on a device.

3       And what that means for this case is, when this court

4   evaluates the search, it must look to what was law

5   enforcement authorized to do?  And what law enforcement was

6   authorized to do was to examine that desktop computer, all of

7   its hard drives, for evidence of dominion and control,

8   including photos and videos.  And as a result, that means the

9   discovery of the child-rape videos created by Mr. Holcomb,

10  plainly was within the scope and sweep of that clear and

11  unambiguous warrant.

12      So the question, of course, is, as the defense notes, why

13  did the police need to get dominion and control?  And the

14  first response I have to that is, that's not really for the

15  defense to decide.  And, in fact, it already has been

16  decided.  A Skagit County Superior Court Judge authorized the

17  police to seize that material.  And that authorization is not

18  based on nothing, it's not based on nonsense or fanciful

19  notions, it's based on a common-sense proposition that the

20  owner of a device matters, when that device is relevant to an

21  investigation.

22      And for the same reason, there were no time limits placed.

23  Not only is there no requirement that there be time limits,

24  but those time limits don't really have meaning, in the

25  context of dominion and control.  Because, after all, if an

**FER-34**

May 11, 2022 - 6

1   old selfie is relevant, so is a new selfie.  If an old video

2   is relevant, so is a new video.  Knowing who used a device

3   five years ago may be relevant, it may not be.  But the

4   standard that the defense would like to set out for the

5   government and the police is to know, ex ante, exactly what

6   they're looking for, and look for only that.  That isn't

7   really how searches work.  It's never how searches have

8   worked, and it simply is not practical.

9          THE COURT:  Mr. Hampton, I saw somewhere in there

10  that the detective was unfamiliar with the program he was

11  using, and he didn't realize it had a time limitation, or he

12  would have limited the search in the way that he did limit

13  the search, you know, in terms of the so-called upper hard

14  drive.  Doesn't that tell you that law enforcement had no

15  need to go any further?

16         MR. HAMPTON:  Well, no, it doesn't, Your Honor,

17  because I want to be clear about the distinction here.

18  Because the warrant authorized a search of the devices for

19  all photos and videos evidencing dominion and control, the

20  date filter portion is not relevant.  That has to do with the

21  circumstance of the particular warrant.  But that is not

22  relevant to the reasonableness inquiry that the Supreme Court

23  has set out, when you assess whether or not the warrant

24  covered what was done here, and whether or not the search was

25  reasonable.

May 11, 2022 - 7

1      I certainly acknowledge that had, for example, date

2  filters been required as to the evidence of dominion and

3  control, we would be in a different scenario.  Though, as I

4  noted, the government's position is, the most that can be

5  said is that the detective in this case made a mistake.  He

6  wasn't aware that the date filters applied.  It was an

7  accident.  And so even if that were true, then good faith

8  would save the warrant.

9      But I don't, as I noted, believe that the court needs to

10  get there, because what the court must assess, in my view, is

11  was what was discovered lawfully within the scope of the

12  warrant?  And that is an objective test based on the warrant

13  itself and the evidence that was uncovered.  I think there's

14  no question that, again, because police had the authority to

15  find images and videos evidencing dominion and control, they

16  had the authority to find these videos, whether or not, and

17  whatever the circumstances may be, they had the option to do

18  that.

19      THE COURT:  And you don't think that a reviewing

20  court should look at that dominion-and-control section and

21  say:  If it really means everything on there, it's an

22  overbroad general warrant, at least as to dominion and

23  control, and the same time limitations should be applied,

24  because dominion and control usually means at the pertinent

25  time when relevant evidence is being sought?

May 11, 2022 - 8

1          MR. HAMPTON:  I would submit, Your Honor, two things.

2   First of all -- I'll do the second one first -- I think

3   dominion and control as to a device is relevant at all times.

4   Because, after all, what if the defendant later claims:  Oh,

5   I was hacked.  That wasn't me.  I didn't create that video.

6   I'm not the one who had that material.  No, no, I was hacked.

7   And, oh, it happened three years ago; or, oh, it happened

8   yesterday.

9       The police can't know, from the beginning, what arguments

10   the defendant might make.  And, in fact, who has used a

11   device, over the life of that device, very well could be

12   relevant at any time.  And now I'm not suggesting --

13          THE COURT:  If you're talking about the abstract,

14   maybe.  But the police in this case knew exactly who had

15   dominion and control over it, because it was Mr. Holcomb who

16   volunteered and turned it over to them.  And they knew the

17   timeframe involved, because they were investigating a rape

18   allegation that took place at a specific time.

19       I don't have a problem with the Skagit County deputy

20   prosecutor saying:  See if there are other, you know, angles

21   or places that might show the interactions between

22   Mr. Holcomb and JJ.  But I don't see any justification for

23   saying that we can just look anywhere we want in the

24   computer, and look at any video or photograph to establish

25   dominion and control, when it's simply not an issue.

May 11, 2022 - 9

1    And you say:  Well, what if Mr. Holcomb or his lawyers

2    raised it later?  You should be so lucky, as a prosecutor, to

3    have a defendant try to do something like that, when he's

4    already admitted to something 180 degrees different.

5        But, go ahead, Mr. Hampton.

6        MR. HAMPTON:  Your Honor, I certainly take your

7    point.  And I recognize these are abstract concerns.  I guess

8    my first response is, of course, that abstract does matter,

9    and it is important, because we don't always know, on the

10   front end, what is going to happen.

11       But even if here the court really believes that the Skagit

12   County judge in this case should have seen things

13   differently, and should have said:  Under the circumstances,

14   I cannot authorize a broader search for dominion-and-control

15   evidence that exceeds the dates of this case.

16       Well, it's not clear to me that that is so obviously

17   correct, or so obviously right, that the police should be

18   punished for relying on what the judge authorized.

19       But more importantly, if the court believes that these

20   date restrictions are really critical, I think there, there

21   actually may need to be more discussion, because it is

22   certainly true that date stamps are relevant to assessing --

23   or they can be a relevant way to filter data on a device.

24       But date information is not always or even necessarily

25   often entirely correct.  It can depend on, what is the clock

1   setting on the device?  A file creation time may mean one

2   thing in one filing system and one thing in another.  And

3   that may not always be conclusive evidence of the date of

4   that image or video, that it was created, that it was used,

5   that it was shared, that it was downloaded, any number of

6   things.

7        And I think many forensic examiners, and my suspicion is

8   -- and, of course, we would have to hear testimony about that

9   -- is that Detective Neufeld would actually say the same

10  thing, that actually sound forensic science does not simply

11  accept date information as the gospel truth, to show what

12  date something was used or created or downloaded.  There is

13  far more to the analysis.  And I think many forensic

14  examiners would say they would not use these date filters.

15       Again, I did not delve those depths particularly heavily,

16  because I don't believe those subjective assessments matter

17  in this case; the court can get there.  But I would say my

18  bottom-line point is, at the end of the day, if this is a

19  concern, and if the court really believes that Judge Riquelme

20  should have drawn something more tightly, that is a fair

21  consideration.  It is not that that is constitutionally

22  compelled, or so clearly constitutionally compelled that the

23  court should punish the police.

24       And that, I guess, does bring me to good faith.  Good

25  faith exists, as the Supreme Court has said, because what the

 1   courts want, what the Fourth Amendment wants, is it wants the

 2   police to do the important and sometimes harder work of going

 3   to a judge, having the judge review, and then honoring the

 4   restrictions imposed by the judge, in addressing their

 5   searches.

 6        And so as the court has noted, reviewing courts in a

 7   suppression case most honor that preference for warrants when

 8   they actually honor the warrants as issued.  And that's not

 9   to say that there may be cases where warrants are so facially

10   invalid, or so clearly contrary to the law, that the police

11   cannot be credited and cannot be given credit for relying on

12   them.

13        But I don't believe that that is the case here.  And that

14   in the end, that search warrant should be upheld.  And it was

15   entirely reasonable for the police to rely on it.  For the

16   same reason, the Supreme Court does require reviewing courts

17   to conduct a balancing, where they look deeply at what

18   exactly is to be deterred, and what exactly is the social

19   cost of suppression.

20        Because the Supreme Court has long noted that suppression

21   is a necessary evil.  But it is a bitter pill that the court

22   and that society should not swallow lightly.  It sometimes

23   must be done, because even though it has the effect of

24   allowing a defendant often to escape responsibility, that

25   individual windfall is worth it, because of the broader

May 11, 2022 - 12

1   societal benefits of deterring police misconduct.

2       But to be clear, that is not because John Holcomb has an

3   individual right to suppression, or because his individual

4   privacy interests are so compelling, it is because all

5   privacy interests are compelling.

6       And I think here, if the court looks at what law

7   enforcement did, at every step of the way they were trying to

8   do the right thing.  They got a search warrant for

9   Mr. Holcomb's residence.  Mr. Holcomb consented to the full

10  search of those devices.

11      Mr. Holcomb withdrew that consent, as he was right to

12  do -- as was his right to do.  And so I don't mean to say

13  that was improper.  But when he withdrew his consent, law

14  enforcement got a search warrant.  They executed that search

15  warrant, to the best of their ability.  And while I recognize

16  that, from Mr. Holcomb's perspective, to his very great

17  misfortune, their search led them down a path that no one

18  anticipated.

19      But I think it's important for the court, in assessing the

20  police conduct to note, it's not as if, say, Detective

21  Neufeld found videos of the encounter with JJ that seemed to

22  undercut her account and said:  Oh, well, it doesn't matter.

23  What did he do?  He stopped, and he called the relevant

24  people, the detective in the case, the prosecutor, and said:

25  I think you should look at this.  I'm not done yet, but I

May 11, 2022 - 13

```
 1  think you should look.  That's exactly what we want police to
 2  do.
 3      And in the end, as the court noted, the prosecutor and
 4  detective said:  Well, thank you, sir, but I think we should
 5  keep going, because we need to finish the search.  We don't
 6  know all the evidence.  And just after is when Detective
 7  Neufeld found the child sexual abuse imagery.
 8      So it's not as if law enforcement was simply digging and
 9  digging and digging, and when they came up with nothing they
10  just had to find something against Mr. Holcomb.  They
11  encountered something that they simply did not anticipate.
12  And I think given when the court looks, holistically, at what
13  the police did here, what exactly is there to deter, other
14  than, at most, they didn't see a search issue the same way,
15  and they didn't anticipate that a later reviewing court would
16  have concerns about how the judge issued that warrant and
17  what restrictions the judge imposed.
18      That's not to diminish the court's role in having those
19  concerns, or its legitimacy in identifying an issue with a
20  search warrant that it cannot abide.  It's not to say that.
21  But it is to say there has been no real deterrent value for
22  the police, because they can't be expected to know when or if
23  a court is going to decide that, even in a close call, or
24  even not a close call, that a warrant is not invalid.  So
25  from my perspective, from the government's perspective, the
```

**FER-42**

May 11, 2022 - 14

1   deterrent value here is, if not zero, it is very close to

2   zero.  Law enforcement will not learn broad lessons about how

3   to do these things better; they might know how to not have

4   this exact situation happen again.  But I'm not sure that's

5   particularly helpful.

6        And so with that, when you compare that to the profound

7   social cost of having a defendant be able to essentially

8   escape liability, escape being tried -- because, of course,

9   it's a trial, it's not an automatic conviction, once

10  suppression is over.  The defendant has the right to all the

11  protections of the Constitution, to allow the truth-seeking

12  function to proceed as it is meant to be.  But to deprive

13  society the ability to have that trial, and if a fact finder

14  concludes beyond a reasonable doubt that the defendant is

15  guilty, that he be held accountable, that is a grave cost

16  that I think, in this case, suppression, as the court has

17  said before, does not pave its way.  And I would urge the

18  court to deny the motion.

19            THE COURT:  Thanks very much, Mr. Hampton.

20       Mr. Hamoudi or Mr. Geist, whoever is going to argue.

21            MR. GEIST:  It will be me, Your Honor.  Thank you.

22            THE COURT:  Okay.  Thanks, Mr. Geist.

23            MR. GEIST:  Thank you, Your Honor.  We're moving to

24  suppress all the evidence and the fruits of this search.

25  What it appears the government is asking for is for the court

1    to overrule the exclusionary rule.  And if this

2    dominion-and-control clause is a generalized provision, then

3    it has to be struck, and that's where the inquiry ends.

4         And to the extent that the court doesn't strike the

5    provision, the court should construe it within the object of

6    the probable cause, the time and the place that the officers

7    were looking into for the allegations from JJ.

8         THE COURT:  Mr. Geist, let me ask you a question.

9    Mr. Holcomb turns over his computer on January 28th, right,

10   and says:  Here, go look at anything you want.

11        And had the detectives not just looked at the video of the

12   encounter that had just occurred with JJ, but found these

13   child pornography videos on there, there wouldn't be an

14   issue, right?

15        MR. GEIST:  Well, if we look at actually what

16   happened, Your Honor, Mr. Holcomb actually tried to limit the

17   scope of his consent.  And the officers told him that he

18   wouldn't be allowed to limit that scope.  Mr. Holcomb was

19   asking for the officers -- while at the police station, and

20   while the officers had the computer -- bring the computer

21   here, let's look at it right now.  Mr. Holcomb was promised

22   that the officers would look at it quickly, and look at the

23   relevant evidence quickly.

24        So I think that while what the court is saying, if someone

25   gives consent to search an entire home, an entire computer,

May 11, 2022 - 16

1    and that they're not misled about the scope of the consent

2    that they're permitted to give, then that's a different

3    situation.  It's one that we didn't get into here, because

4    after Mr. Holcomb was released, he went to the police station

5    and withdrew that consent.  And that was communicated to all

6    the law enforcement officers.  And that's when they got that

7    warrant.

8           THE COURT:  So he withdrew on February 3rd, and they

9    got the warrant on February 4th.  But does the fact that he

10   -- that could have been found in that period between

11   January 28th and the withdrawal on February 3rd, does that

12   enter into, at all, the deterrence outweighed by substantial

13   societal cost factor; or is it just a nullity, once he

14   revokes the consent?

15          MR. GEIST:  Once the consent is revoked, it's as if

16   it never occurred.  So what we're dealing with here is

17   whether there is a permissible search, based on this warrant,

18   whether it violated the Fourth Amendment.

19       So as far as the provision that we're talking about here,

20   and the time and place, the time period for this allegation

21   with JJ is set out in the provisions of the warrant.  And

22   even within the provisions of the warrant, what we're looking

23   at, that fifth clause, it allows for searches of files,

24   artifacts, or information, including but not limited to

25   documents, photographs, videos, e-mails, social media posts,

May 11, 2022 - 17

1   chats and internet cache, that would show dominion and

2   control for the devices.

3        This is a warrant that allows a search for anything on the

4   computer, without limitation.  And that's what makes it a

5   general warrant.  The government is agreeing that that's what

6   it does here.

7        So it's not an issue of whether this was within the scope

8   of the warrant or not.  The government is saying that there

9   is no scope to this warrant, that it allowed the officers to

10  do whatever they want to, as far as searching that computer.

11  Once we get to that point, there is no good-faith reliance on

12  a general warrant.  Because if there is no warrant, it's like

13  it's a warrantless search at that point.

14       So in the -- in the affidavit, the dominion and control,

15  that was uncontroverted.  I think it's important to realize

16  what the government is saying about the warrant, and I just

17  said this, that the dominion-and-control clause had no

18  temporal limitation.  And not just that, it had no limitation

19  on where the officers could search.

20       The government also had claimed that the

21  dominion-and-control clause authorized the police to search

22  the entire computer and to search the entirety of

23  Mr. Holcomb's devices.  That's at Docket 41 at 23, 24 in the

24  government's response.

25       The government also claims that the computer search

May 11, 2022 - 18

1   warrant placed no temporal limit on the police's ability to

2   seize photos and videos showing dominion and control.  But,

3   again, the warrant itself had no limitation within that

4   clause.

5       So based on that -- based on the government's

6   interpretation of the warrant, a warrant that allows officers

7   to search the entire computer without limitation, it said --

8   the government says that the police stayed within the scope

9   of the computer search warrant.  And as I said, if it's just

10  a general warrant that allows them to search anything, of

11  course they're going to be staying within the scope of a

12  general warrant.  So, again, it seems that the government has

13  conceded that point, that this is a general warrant.

14      But general warrants are not permitted.  So at the outset,

15  if we're looking at the face of the warrant, and that's the

16  first part of this analysis here, if we're just looking at

17  what the warrant permitted and incorporating the affidavit,

18  then this would be something that would allow a generalized

19  search.

20      A review of the facts -- and it's very important, because

21  some of the facts have been raised here, the evidence of the

22  alleged rape, that would have been from January 27, 2020, and

23  after.  Officers seized the computer on January 28th.  And

24  this is really important, Your Honor, while the officers are

25  at Mr. Holcomb's home and they're seizing this computer, they

1  see that there are two screens.  They're not sure what they

2  are.  They end up being computer screens.  But what the

3  officers do is they send one officer back to the police

4  station.  And why did they do that?  They did that because

5  they asked that officer to write up another warrant to be

6  able to seize additional devices.

7      Now, eventually they didn't actually write another

8  warrant, because they realized that these were just two

9  computer screens and we don't need to seize them.  But this

10  is clear evidence that these officers know that they need to

11  go back to a judge when they're working outside of the scope

12  of a warrant.  That's not ultimately what happened here,

13  though.

14      So the officers, they knew that the computer belonged to

15  Mr. Holcomb.  I don't think dominion and control was ever in

16  dispute.  And I agree with Your Honor that if Mr. Hamoudi or

17  I, or any defense lawyer, went into court and tried to say

18  that this computer didn't belong to Mr. Holcomb, then it

19  would be ineffective in representing Mr. Holcomb.

20      So the police -- they have the upper hard drive and then

21  they have the lower hard drive.  The police searched the

22  upper hard drive and they determined that JJ lied and that no

23  rape had occurred.  All three agree on that.  And we have the

24  exhibits for that.

25      Mr. Platter, the prosecutor, wrote a letter saying that

May 11, 2022 - 20

1   upon viewing the evidence it was determined that no offense

2   had been committed.

3       It's also important to look back at what Detective Neufeld

4   did when he was analyzing the computer.  When he was looking

5   at the upper hard drive, the one that contained the video

6   surveillance, he initiates that search by just going back and

7   he's searching in 2015.  That's when he sees videos of

8   Mr. Holcomb's wife, and she's having sex on those videos.

9       So right from the outset, it's not a limited scope search,

10  based off what is -- what they know about probable cause for

11  this incident in January 2020.  It's just generalized:  Let's

12  go back and look at videos, even going back to 2015, right

13  from the outset.

14      So this upper hard drive contained all the video

15  surveillance related to the rape accusation.  It had folders

16  within the upper hard drive.  The upper hard drive had

17  folders within it that delineated the surveillance camera and

18  associated footage.  So there were three folders for the

19  three cameras located in Mr. Holcomb's residence.  Two of

20  those cameras were not inside, they were outside.  There was

21  only one camera that was inside.  And in the government's

22  response they indicate there was only one camera.  All the

23  officers knew that there was only one camera inside.  There's

24  never any indication that there were multiple cameras inside

25  the home.

1      So the file names stated the location of the camera with

2   the date and the time on them.  So this was something that

3   would be easy, if you're looking for items that occurred in

4   January 2020 and later, especially on January 27th.  It was

5   easy to find where these items were, especially for a trained

6   forensics analyst like Detective Neufeld.

7      758 videos fell within the timeframe for the probable

8   cause for this warrant, January 27th and later.  And among

9   those, only 309 video files were from the indoor camera

10  folder.

11     So Detective Kuschnereit wrote in his report that upon

12  viewing those videos he observed that Mr. Holcomb did not

13  physically restrain JJ.  And all three men who viewed that

14  video agreed that no crime was committed.

15     Now, about one hour after watching the video, that was on

16  the morning of February 21st, Detective Kuschnereit sends an

17  e-mail to the Washington State Lab that is processing the DNA

18  evidence.  He tells the lab to stop processing evidence of a

19  rape, because the case was going to be dismissed.

20     After watching this video, no one follows up with JJ.

21  They don't need to, because they know no crime was committed.

22  They don't afford her even the opportunity to say what

23  happened here.  That's evidence that it was so obvious that

24  what was on this video surveillance made it clear that no

25  crime was committed.

1       So the police then, while every single surveillance video

2  is located on the upper hard drive, and after they determine

3  that probable cause no longer exists for a rape, they decide

4  to continue searching -- at the time they say to "process"

5  the computer.  They bring that up.  But at this point the

6  warrant is expired.  Once the probable cause is gone, the

7  warrant has expired.  And what they're doing now is they're

8  performing a warrantless search.  They're not performing a

9  search within the confines of the warrant, unless it's a

10  general warrant, which isn't permitted.

11      So they search the lower hard drive, after the probable

12  cause that permitted the search in the first place had

13  completely diminished, it completely vanished.  And when they

14  searched this lower hard drive, they knew that they were

15  going to be searching in a place that didn't contain any

16  video surveillance related to these allegations.  There was

17  no other angle to be looking at.  They knew that, because

18  they knew that there was only one camera inside the home.

19  And that's in all of their reports.  That's why we included

20  those facts, Your Honor.

21      Now, on that lower hard drive, this is also very

22  important, there's a Detective Neufeld, who is a trained

23  forensic analyst, he's looking on there.  And every single

24  file on that lower hard drive was created on or before

25  September of 2018.  There's nothing on there that can relate

May 11, 2022 - 23

1    to the probable cause that caused them to get the warrant in

2    the first place, especially after they realize that probable

3    cause has completely evaporated.

4         So if the government is permitted to prevail on this issue

5    by allowing a dominion-and-control clause to allow a search

6    of a computer, without any limitation, then what will happen

7    is every search warrant application -- and many of them

8    currently do have this -- every search warrant application

9    will contain a dominion-and-control clause.  Every warrant,

10   every single warrant will permit the government to search the

11   entirety of a device, unrelated to probable cause or the

12   reason for the search, and even after the officers know that

13   probable cause that supported the warrant no longer existed.

14        As far as dominion and control even relating or being

15   relevant to surveillance video, that's -- the officers knew

16   that they were looking for surveillance video.  That was

17   exactly why they got the warrant.  They knew that there would

18   be surveillance video on this computer.  They found it.  But

19   to the point of dominion and control, dominion and control is

20   never really relevant to surveillance video.  The

21   surveillance video shows what it shows.  It doesn't matter

22   who has dominion and control over surveillance video.  It

23   doesn't matter who used the computer when it comes to that

24   surveillance video.  Even if dominion and control were

25   relevant to video surveillance, that dominion and control

1    would only pertain to January 27, 2020, and beyond.

2         Now, to this point, I think it's important to look at how

3    did Detective Kuschnereit, who used Cellebrite software to

4    search the cell phone, to search Mr. Holcomb's cell phone,

5    when Detective Kuschnereit searched that cell phone, it shows

6    evidence of what he knew the confines of that warrant to be.

7    He did not go back to 2015 or 2016, any of those years.  He

8    went to -- the earliest that he could go, I believe, is June

9    or August of 2019.

10        And what he did, using that Cellebrite software, he went

11   and found the evidence that was relevant to the probable

12   cause.

13        So it's -- what's also unclear is how anyone, as far as

14   dominion and control, how anyone could go back in time before

15   an event -- here we're talking about January 27, 2020 -- go

16   back, prior to that event, to alter or destroy the video or

17   evidence that had not yet occurred on the surveillance.

18        And it also begs the question of why someone would alter

19   or destroy evidence that exonerates them.

20        As far as the good-faith application, Your Honor, if the

21   warrant is a general warrant, then good faith does not apply.

22   And the government has told us that this is a general

23   warrant.

24        The good-faith doctrine supports an officer's reasonable

25   reliance on a warrant validly issued by a judge.  Here the

May 11, 2022 - 25

1    warrant wasn't valid, first, because we believe it lacked

2    probable cause.  But even if there was probable cause, good

3    faith doesn't apply, because that probable cause dissipated

4    the moment these three men, the officers, viewed the video.

5         And so we -- unless the court has additional questions,

6    Your Honor, we're asking the court to grant this motion to

7    suppress.  Our concern is that if this warrant is permitted

8    to stand, then the government now has a way to ask for and

9    receive general warrants that will allow them to search

10   anyone's computer, for anything, and not related to any

11   specific crime at all.

12        Thank you, Your Honor.

13        THE COURT:  Thanks, Mr. Geist.

14        Mr. Hampton, a couple of minutes of rebuttal.

15        MR. HAMPTON:  I will endeavor to respect the court's

16   time.  I think I can respond on a few very quick points.

17        The first thing I want to say is, I don't believe that a

18   ruling here will forever permit the government to do anything

19   it wants.  Because, after all, what that will do is allow a

20   trial to proceed in this case.  And then if other defendants

21   have concerns about searches in their cases, they too can

22   avail themselves of the remedies of suppression, if they are

23   entitled to them.

24        But more importantly, and I want to be absolutely clear, I

25   do not believe I have, and certainly I did not intend to

```
 1  concede that this is a general warrant.  I recognize the
 2  court may find that the dominion-and-control provision was
 3  overbroad; or it could find that because it lacked date
 4  filter.  That's not the same as a general warrant.  Nor is my
 5  position that the police can simply search anything they
 6  want, whatever they want, however they want.
 7      My point was, the warrant authorized the police to search
 8  for and seize dominion-and-control evidence, including in the
 9  form of videos and photos.
10      And I cannot understand in what world that would not allow
11  the police to search the hard drives in a computer, each of
12  which is a place where a photo or video can be stored, and
13  then look at photos and videos to determine if they are
14  responsive to the warrant.  It simply would make no sense
15  otherwise.  And that is my fundamental point, is not they can
16  just have anything they want.  It's the warrant tells them
17  what they can do.  And what it authorized them to look for
18  was that evidence of dominion and control, including some
19  other types of files.
20      And I write these computer warrants all the time, with
21  agents.  And there's lots of information about all the ways
22  various files can be of relevance, that are included in the
23  search warrant affidavits and very detailed attachments,
24  outlining what can be done.
25      It wasn't precisely done that way here, and I recognize
```

1  that.  But at the end of the day, what matters is what the

2  warrant says.

3       Second, I do not believe anyone has ever concluded that

4  Mr. Holcomb did not commit a crime.  I don't see a letter

5  from a prosecutor exonerating him and apologizing for the

6  trouble.  I don't see the police setting up a parade in his

7  honor, to demonstrate how nothing bad -- he's never done

8  anything wrong.  It simply is the case that the prosecutor

9  concluded that they could not proceed, as prosecutors do all

10  over this country all the time.  And that if new evidence

11  came to light, they may well refile.  That has not happened

12  yet.  But there is no agreement among everybody, on the law

13  enforcement side, that John Holcomb never committed a crime.

14       Finally, I think the defense focus on all the details on

15  what ultimately was on the computer, and what was in

16  everyone's minds at the time, that shows why exactly the

17  Supreme Court has outlined an objective test for assessing

18  warrants and the execution of warrants.  Because the moment

19  the court begins to plumb the depths of, well, were all the

20  surveillance files on this hard drive, and could law

21  enforcement have known that?  It is simply dizzying.

22       How in that world could the court craft clear,

23  understandable rules for the police to follow, so that, in

24  fact, they can avoid these very suppression challenges.  And

25  when the court applies that objective test, this warrant

May 11, 2022 - 28

1   authorized what happened here.  And even if it shouldn't, the

2   police were reasonable and acted in good faith to rely on

3   what that warrant authorized.

4          THE COURT:  Thanks, Mr. Hampton.

5       You know, this is not about punishing the police.  They're

6   doing their job, and you're doing your job, and I'm doing my

7   job.  And it's the justice system that has to work these

8   difficult situations out.

9       And, my goodness, nobody is saying Mr. Holcomb never

10  committed a crime.  Maybe not on January 27th of 2020; but,

11  you know, that video is just awful.

12      So really it's about, did the warrant in state court,

13  which was well limited on Items 1, 2, 3 and 4, go too far in

14  not being more limited on Item 5, dominion and control, as to

15  time and date limitations?  And it's the court's conclusions

16  that the warrant did go too far in that area and was into a

17  situation where it covered too much area.

18      And I think that the detective who was searching the

19  computer, when that detective saw the lower hard drive had

20  only pre-2018 matters there, should not have gone any further

21  in looking at those videos.

22      So I then move on to the good-faith exception and societal

23  costs here.  And I believe that Mr. Geist is correct, that if

24  it's in the nature of a general warrant, and that Item No. 5

25  was, the *Leon* good-faith exception does not apply, nor can I

May 11, 2022 - 29

1   find in a circumstance where there is no good-faith

2   exception, that deterrence is outweighed by substantial

3   societal costs.

4       So I'm going to grant the motion to suppress.  And I will

5   get out an order by Friday.  I don't want to just sign the

6   order that the defense submitted, I want to give my reasons.

7   And if the government decides it wants to take an appeal of

8   that as a pretrial order, I would support the government's

9   decision in that area, in the sense of staying the matter

10  until you have a chance to consult with Main Justice to get

11  authorization and go forward from there.

12      I certainly wouldn't mind being overruled by the Ninth

13  Circuit on this one.  But I have to call it as I see it under

14  the laws as they stand here.  And I believe that the motion

15  to suppress should be granted.

16      So, anything further, Mr. Geist, that you wanted to raise

17  to me?

18          MR. GEIST:  No.  Thank you, Your Honor.

19          THE COURT:  All right, Mr. Hampton?

20          MR. HAMPTON:  No.  Thank you, Your Honor.  And just

21  so the court knows, and for defense's awareness, so they can

22  expect, I will be consulting with my appellate folks and we

23  will do our best to make a prompt -- at least a prompt

24  initial decision from our office.  But, of course, any

25  decision to appeal, as the court notes, requires significant

May 11, 2022 - 30

1    approval.  So I'd imagine it would be some time before we

2    have a final answer one way or another.  But we will look

3    into it immediately and make as quick progress as we can to

4    reach a final decision.

5                THE COURT:  Okay.

6        And as I say, I'll try to get this order out no later than

7    Friday.  I might have a chance of getting it out sooner.  All

8    right.  Thanks very much for the excellent briefing and

9    presentations of the case.  We'll be adjourned.

10               MR. HAMPTON:  Thank you, Your Honor.

11                    (Adjourned.)

12

13               C E R T I F I C A T E

14

15       I certify that the foregoing is a correct transcript from

16   the record of proceedings in the above-entitled matter.

17

18

19

20   /s/ Debbie Zurn

21   DEBBIE ZURN
     COURT REPORTER

22

23

24

25

**FER-59**