No. 23-469
[NO. 2:21-cr-00075-RSL, USDC, W.D. Washington]

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOHN HOLCOMB,

Defendant-Appellant.

# UNITED STATES' PETITION FOR EN BANC REVIEW OR, ALTERNATIVELY, PANEL REHEARING

Appeal from the United States District Court
for the Western District of Washington at Seattle
The Honorable Robert S. Lasnik
United States District Judge

MIRIAM HINMAN
Assistant United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Telephone: 206-553-7970

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .... iii

INTRODUCTION .... 1

BACKGROUND .... 4

I. While searching for video evidence in a rape investigation, police find child-rape videos .... 4

 A. First warrant .... 4

 B. Second warrant and discovery of child-rape videos .... 5

 C. Third warrant and state proceedings .... 8

II. District court proceedings .... 9

III. A divided panel reverses and orders suppression .... 10

 A. Majority .... 10

 B. Partial dissent .... 10

IV. After withdrawing its opinion, the divided panel again reverses and orders suppression .... 11

 A. Majority .... 11

 B. Dissent .... 12

ARGUMENT ........................................................................................ 12

I. The Court should rehear the case en banc because the suppression holding is inconsistent with Supreme Court precedent ........................................................................ 13

II. Alternatively, the panel should rehear the case because the dissipation ruling misapprehended key facts and law ........................................................................................ 20

CONCLUSION ..................................................................................... 22

# TABLE OF AUTHORITIES

## Federal Cases

*Davis v. United States*,
564 U.S. 229 (2011)........................................................... 13, 20

*Harte v. Board of Commissioners*,
864 F.3d 1154 (10th Cir. 2017)........................................................15

*Harte v. Board of Commissioners*,
940 F.3d 498 (10th Cir. 2019)..........................................................15

*Herring v. United States*,
555 U.S. 135 (2009)...........................................................................13

*Manriquez v. Ensley*,
46 F.4th 1124 (9th Cir. 2022) ..........................................................14

*Messerschmidt v. Millender*,
565 U.S. 535 (2012)...........................................................................19

*Nicholson v. City of Los Angeles*,
935 F.3d 685 (9th Cir. 2019)............................................................15

*United States v. Bowling*,
900 F.2d 926 (6th Cir. 1990)............................................................15

*United States v. Carbajal*,
956 F.2d 924 (9th Cir. 1992)............................................................21

*United States v. Grubbs*,
547 U.S. 90 (2006)............................................................................15

*United States v. Holcomb*,
132 F.4th 1118 (9th Cir.),
*withdrawn*, 153 F.4th 965 (9th Cir. 2025) .........................................10

*United States v. Holcomb*,
183 F.4th 704 (9th Cir. 2026) .................................................. passim

*United States v. Lopez*,
482 F.3d 1067 (9th Cir. 2007)........................................................15

*United States v. Needham*,
718 F.3d 1190 (9th Cir. 2013)........................................................14

*United States v. Ortiz-Hernandez*,
427 F.3d 567 (9th Cir. 2005)..........................................................15

*United States v. Pabon*,
871 F.3d 164 (2d Cir. 2017) ..........................................................16

*United States v. Perkins*,
850 F.3d 1109 (9th Cir. 2017)........................................................21

*Zorn v. Linton*,
607 U.S. 568 (2026).........................................................................14

**Federal Rules**

Federal Rules of Appellate Procedure,
Rule 10(e)(2)...........................................................................21, 22
Rule 40(b)(2)...................................................................................3

## INTRODUCTION

A woman, J.J., accused John Holcomb of sexually assaulting her after consensual sex and recording some of their sex. Police obtained a warrant to seize Holcomb's computer, plus a second warrant to search it for video and other evidence. While searching the computer, the examiner saw video clips of Holcomb and J.J. having sex that to the examiner did not appear forcible. The examiner then showed a few clips to the lead detective and a prosecutor. The prosecutor directed the examiner to keep searching for other videos depicting the encounter from a different angle. When the examiner did so, he soon saw a video of Holcomb raping a 6- or 7-year-old girl. The district court rejected Holcomb's argument that the first videos were so "patently exculpatory" that there was no longer probable cause to continue the search. ER-37.

A divided panel held that Holcomb's child-rape video must be suppressed. *United States v. Holcomb*, 183 F.4th 704 (9th Cir. 2026). While probable cause existed at the search's inception, the majority held that probable cause dissipated when investigators located allegedly exculpatory video, and the officers' actions in continuing to search were so egregious that suppression was required. Never mind that the

examiner, lead detective, and state prosecutor did not think this video was so exculpatory as to preclude further investigation. And never mind the district court's conclusion that nothing in the record showed that the video was so "patently exculpatory" that the search had to end. Instead, *without ever watching the video*, the majority concluded that not only were all these judgments wrong, they were so egregiously wrong that suppression is required.

The majority's conclusions, reached without viewing the video evidence, warrant further review. First, and most important, the majority's application of the exclusionary rule contravenes the Supreme Court's recent precedents, which make officer culpability the focus of the inquiry. The officers acted reasonably, not recklessly, when they continued their search after finding some videos of the alleged rape. The majority's Fourth Amendment holding—officers executing a warrant must stop searching if probable cause dissipates based on review of potential evidence found during the search—is a novel application of the dissipation rule. No precedent had previously applied that rule to address a claim that the evaluation of evidence within the scope of the warrant caused probable cause to dissipate, let alone applied it to an ongoing

search of an electronic device. Yet the majority held no reasonable officer would have failed to anticipate its unprecedented application of the dissipation rule.

The majority also had no basis in the record to conclude that the video showed "the alleged rape … almost certainly had not occurred." 183 F.4th at 716. The officers and prosecutor who *actually watched the video* apparently did not draw that conclusion. And reasonable officers could have believed that probable cause still existed based on the videos, the victim's allegations, and evidence that Holcomb was lying. Accordingly, when the examiner who found the videos consulted the lead detective and prosecutor, the prosecutor reasonably directed the examiner to keep looking for other videos of the encounter under investigation.

The majority's application of the exclusionary rule diverges from precedent and raises questions of exceptional importance. FRAP 40(b)(2). Simply put, the majority would free a child rapist based on a novel legal holding and unfounded conclusions about videos the panel has never seen. Neither the Fourth Amendment nor controlling precedent requires this result.

The Court should vacate the panel opinion and rehear the case en banc. Alternatively, the panel should revisit its ruling after either watching the disputed videos or remanding to the district court for fact-finding about their content in the first instance, as is the usual course.

## BACKGROUND

### I. While searching for video evidence in a rape investigation, police find child-rape videos

#### *A. First warrant*

J.J. said Holcomb sexually assaulted her after earlier consensual sex. ER-13, 81, 97–100, 128–30. J.J. reported that during oral sex, she communicated that she wanted to stop, but Holcomb instead pushed her head down onto his penis repeatedly and penetrated her anus with his finger, causing significant pain. ER-99–100. She also said Holcomb used his cellphone to record some of the earlier sex. ER-99. Police obtained a warrant to search Holcomb's house. That unchallenged warrant authorized seizure of evidence including Holcomb's cellphone and a desktop computer. ER-95–104.

When executing that warrant, officers saw a surveillance system with a camera pointing at the bed where Holcomb allegedly assaulted J.J. ER-117. On computer monitors, officers saw surveillance footage

from the camera, plus Signal chats between Holcomb and J.J., and Holcomb and his partner Jill. ER-117, 132–33. Holcomb claimed he was "drugged" and did not remember having sex with J.J., although he admitted that a hospital found no evidence of drugs. ER-133–34. He said that Jill watched video on his desktop showing the sex was consensual and encouraged police to watch it. ER-133–34. He told police that his laptop might have recorded additional video. ER-134. He consented to searches of his desktop and phone but withdrew consent a few days later. ER-108–10, 113–14, 122–23.

### *B. Second warrant and discovery of child-rape videos*

Police obtained another warrant authorizing a search of Holcomb's desktop, laptop, and phone for evidence of the alleged rape. ER-76–77. The affidavit set out the contested versions of the alleged assault and showed the importance of video evidence and evidence about who had ability to access or modify video. ER-125–35. This warrant authorized the seizure of five categories of evidence. The first four included date limitations related to the time of the alleged rape—e.g., "Surveillance video or images depicting [J.J.] or JOHN HOLCOMB and any other surveillance video or images from Jan 26th 2020 to current." ER-76–77,

125–26. The fifth called for evidence "that would show dominion and control" and was not date-limited. ER-77, 126.

A forensic examiner began reviewing Holcomb's devices. On Holcomb's phone were messages with Jill in which Holcomb claimed he was asleep at the time of the alleged assault. ER-147. After that, the examiner reviewed Holcomb's desktop by pulling up thumbnail images of videos. ER-71, 136, 146, 155–57. He soon informed the lead detective that he had found video of Holcomb and J.J. having sex. ER-142, 155. The examiner relayed that "from what he could tell," the oral sex did not appear forcible to him, but "the details of the sexual encounter otherwise matched what [J.J.] had reported." ER-142. In some video, he saw Holcomb taking photos and video of J.J. with his phone. *Id.* The lead detective documented what he had heard from the examiner in one paragraph. *See* ER-142.

The examiner, lead detective, and state prosecutor met the next morning to preview some of the video, although the examiner had not completed the search. ER-143, 151–52. The examiner played "a few of the videos" of Holcomb and J.J. having sex. ER-143.

In a one-paragraph summary, the detective documented details only about "[t]he last video clip," which he wrote showed "that JJ does appear to be willingly performing oral sex," he could "see HOLCOMB's left hand reaching over to touch [her] butt," and "his right hand is resting on the upper part of his chest." ER-143. No report in the record documented how many clips of the oral-sex encounter had been found, nor whether they provided continuous coverage. *See* ER-142–143. And no report documented whether any videos showed Holcomb's hand on J.J.'s head, whether Holcomb's hand on J.J.'s butt was at her anus, or whether J.J. expressed pain. *See* ER-142–143.

Although they had not yet observed any video that appeared to them to show Holcomb forcing J.J. to engage in oral sex, the lead detective and the prosecutor believed it was appropriate to continue the investigation. ER-143, 151–52, 155–56. The prosecutor advised the examiner to "continue looking for additional surveillance videos or angles that may be present." ER-143.

Within 90 minutes, the examiner found three videos showing suspected child sex abuse.[1] SER-216; ER-33. While searching for surveillance video, the examiner saw a thumbnail image of a "black and white video file which appeared similar to the video of HOLCOMB and JJ having sex." SER-216. He thought it was "additional surveillance video from HOLCOMB's residence." *Id.* Once the examiner played it, he saw a man raping a prepubescent girl. *Id.*

The examiner also noticed two color videos of suspected child pornography, but he did not play them. SER-216–17; ER-136. He stopped the search, and police obtained a new warrant. *Id.*

### *C. Third warrant and state proceedings*

Police seized Holcomb's child-rape videos under a third warrant. ER-197–98. The state charged him with child-exploitation crimes.

[1] In faulting the examiner for continuing the search, the majority noted that the detective "directed the Washington State Patrol Crime Laboratory to 'stop all testing except for the required testing' because he expected that the case would be dismissed soon." 183 F.4th at 710. But that lab was conducting DNA testing, and the detective was responding to a scientist's message that "DNA testing will not be able to provide any useful information for this case because the victim and suspect had consensual sex." ER-150. Plus, the detective did not email the lab until *after* the examiner discovered the child-rape videos. ER-150; SER-216.

ER-155. He moved to suppress. SER-115–31. Before responding, the state dropped its charges. ER-153–56.

## II. District court proceedings

Holcomb was charged federally with producing child pornography. ER-199–201. He moved to suppress, arguing that the search and seizure of his child-rape videos violated the Fourth Amendment. SER-132–71.

The district court rejected several of Holcomb's claims, including his claim that police had to stop searching when they found the video of Holcomb and J.J. ER-36–37. The court concluded that precedent "does not indicate that an officer must cease executing a search warrant in accordance with its terms based on what officers discover." ER-37. Besides, "the record indicates that Skagit County law enforcement did not consider the surveillance video to be as patently exculpatory as defendant asserts." *Id.*

Initially, the district court agreed with Holcomb that the second warrant was overbroad and lacked particularity because its dominion-and-control provision lacked time restrictions, and the court found *Leon*'s good-faith doctrine inapplicable. ER-38–45. But on reconsideration, it

found the good-faith exception did apply given "a lack of definition in the contours of the law at issue." ER-22.

Holcomb pleaded guilty to producing child pornography and admitted raping his 6- or 7-year-old victim. SER-4–18.

## III. A divided panel reverses and orders suppression

### *A. Majority*

In its initial opinion, the Court held that the dominion-and-control provision was overbroad and lacked particularity because it contained no "temporal limitations." *United States v. Holcomb*, 132 F.4th 1118, 1127–29 (9th Cir.) (Rakoff, J.), *withdrawn*, 153 F.4th 965 (9th Cir. 2025). Because the provision's unconstitutionality was supposedly clear, the majority held the good-faith doctrine inapplicable. *Id.* at 1131–35. Finally, the plain-view doctrine was inapplicable, too, because the dominion-and-control provision made this warrant "a general warrant." *Id.* at 1135.

### *B. Partial dissent*

Judge Sung dissented in part. 132 F.4th at 1135–38. She agreed the dominion-and-control provision was invalid but thought that it could be severed and that the plain-view and good-faith doctrines could apply

based on valid provisions of the warrant. She would have remanded for fact-finding.

## IV. After withdrawing its opinion, the divided panel again reverses and orders suppression

In response to the government's petition for rehearing en banc, the panel withdrew its opinion and issued a revised per curiam opinion. *See Holcomb*, 183 F.4th 704.

### *A. Majority*

The majority again held that the dominion-and-control provision made the warrant overbroad and insufficiently particular. 183 F.4th at 713–15. It acknowledged, however, that "potentially analogous cases … may have led the officers to believe that such a broad search was lawful" and therefore "assume[d], without deciding, that the officers acted in good faith when they initiated the search." *Id.* at 716.

But, the majority held, "probable cause dissipated when the officers discovered the video of the alleged rape, showing them that the alleged crime described in the warrant … almost certainly had not occurred." *Id.* at 716. And the exclusionary rule applied because "no reasonable officer would continue searching after probable cause dissipated, and no reasonable officer could have concluded that probable cause existed after

watching the video." *Id.* at 718. The majority reached this conclusion *without viewing the video*.

### *B. Dissent*

Judge Sung dissented. 183 F.4th at 725–44. She saw no precedent for the majority's rule about dissipation of probable cause. *Id.* at 728–37. She also believed that probable cause had not dissipated and faulted the majority for reaching such definitive conclusions about the video without viewing it. *Id.* at 727, 737–41.

## ARGUMENT

Investigators executed the warrant reasonably when they continued to search after finding some videos of the alleged rape. The Court should rehear this case en banc because the majority deviated from precedent by excluding the child-rape videos based on its novel dissipation holding and its conclusion that the videos—*which the panel has never seen*—were so obviously exculpatory that no reasonable officer could have concluded otherwise. Alternatively, the panel should rehear this case and reconsider its ruling after either supplementing the record and viewing these videos, or remanding to the district court for factual findings about their contents.

## I. The Court should rehear the case en banc because the suppression holding is inconsistent with Supreme Court precedent

Investigators were not reckless to continue their search after finding videos of the alleged rape. There was no precedent in any circuit about dissipation of probable cause based on review of items found while executing a search warrant, and a reasonable officer also could have concluded that probable cause existed. The panel's application of the exclusionary rule under these circumstances diverged from Supreme Court precedent.

The objective-reasonableness exception to the exclusionary rule applies to searches in general, not just to reliance on a warrant. *See Davis v. United States*, 564 U.S. 229, 239–41 (2011). Whether evidence should be excluded "turns on the culpability of the police." *Herring v. United States*, 555 U.S. 135, 137 (2009). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. … [T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct …." *Id.* at 144.

There is an intra-circuit split about whether the good-faith reasonableness standard is the same as the qualified-immunity standard. *Compare United States v. Needham*, 718 F.3d 1190, 1195 (9th Cir. 2013) *with Manriquez v. Ensley*, 46 F.4th 1124, 1130 n.1 (9th Cir. 2022). The qualified-immunity standard protects officers' actions "unless their conduct violates clearly established law," which means that "precedent must define the right with a high degree of specificity, so that every reasonable official would interpret it to establish the particular rule." *Zorn v. Linton*, 607 U.S. 568, 571–72 (2026) (quotation marks omitted).

Here, the lack of precedent about dissipation of probable cause during a search bars the exclusion of evidence. The majority sought to avoid the dispute about the governing standard by declaring that "the legal principles that rendered the officers' actions unreasonable are all clearly established." 183 F.4th at 718 n.5. That is wrong. There was no Supreme Court or Ninth Circuit precedent about dissipation of probable cause during an ongoing warranted search. Instead, the majority relied on a footnote in a Supreme Court case mentioning the general principle that probable cause may dissipate before a warrant is executed and Ninth

Circuit cases about warrantless arrests. *See* 183 F.4th at 716, 718 (citing *United States v. Grubbs*, 547 U.S. 90, 95 n.2 (2006); *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005); *Nicholson v. City of Los Angeles*, 935 F.3d 685, 691 (9th Cir. 2019); *United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007)).

Even if *Herring*'s standard is not equivalent to the qualified-immunity standard, officers could not be deliberate, reckless, or grossly negligent when there was no precedent in any circuit about a need to reevaluate probable cause during a search based on the items found. The majority contended that *United States v. Bowling*, 900 F.2d 926 (6th Cir. 1990), requires officers to reevaluate probable cause during a search, but there the consent search pertinent to the probable-cause determination occurred before any search under the warrant began, and the court found that the prior search was not so extensive that it undermined probable cause. *Id.* at 929, 934. The majority also pointed to an opinion discussing dissipation of probable cause during a search in *Harte v. Board of Commissioners*, 864 F.3d 1154 (10th Cir. 2017). But this discussion is not precedential. *Harte v. Board of Commissioners*, 940 F.3d 498, 513–14 (10th Cir. 2019).

The majority cited various cases about probable cause becoming stale before officers began to execute a search warrant, *see* 183 F.4th at 716–17, but those cases did not provide any notice that a court would expect officers to conduct an ongoing assessment of probable cause based on items found during a search. Indeed, there are reasons that officers might expect a court to treat the warrant-execution process differently. Electronic devices frequently contain a mix of inculpatory and arguably exculpatory material, and it is not intuitive that the lawfulness of continuing a warranted search depends on the fortuitous fact of when pieces of evidence are discovered. Officers could reasonably believe they would be afforded some flexibility to conduct thorough searches rather than having to reevaluate probable cause with each new item found. *Cf. United States v. Pabon*, 871 F.3d 164, 176–77 (2d Cir. 2017) ("requiring officers continually to make moment-to-moment assessments of probable cause could misallocate limited police resources").

The district court correctly found that precedent "does not indicate that an officer must cease executing a search warrant in accordance with its terms based on what officers discover." ER-37. Since no precedent had applied the general dissipation rule in the context of an ongoing search,

officers could not be reckless for failing to recognize the majority's novel application of this rule.

Even if the majority's rule had been clearly established, continuing the search here would not have been reckless because a reasonable officer could have believed that probable cause still existed. The majority asserted that "no reasonable officer could have concluded that probable cause existed after watching the video," 183 F.4th at 718, which is a hard conclusion to reach without having watched the videos. And nothing else in the record supported that determination.

J.J. alleged that Holcomb pushed her head down onto his penis and inserted his finger in her anus, causing pain. ER-99–100. The majority found that the video—which it has never seen—undermined those allegations because it showed "that [Holcomb] did not place his hand on [J.J.'s] head" and was merely "'[t]ouch[ing] her butt' without any physical restraint and without any apparent reaction by JJ." 183 F.4th at 717, 719. The majority relied on a one-paragraph description of the lead detective's subjective interpretation of just one video clip, when multiple clips existed, and another one-paragraph summary with a second-hand description of the examiner's subjective assessment of the videos. *Id.*; *see*

ER-142–43. Neither summary stated whether any videos showed Holcomb's hand on J.J.'s head, whether his hand on her butt was located at her anus, or whether J.J. indicated pain. *See* ER-142–43. In fact, the examiner told the detective that "the details of the sexual encounter … matched what [J.J.] had reported," except the examiner did not, in his view, perceive force in the videos. ER-142. The majority thus had no basis to make its findings about the placement of Holcomb's hands or J.J.'s reaction. To make findings on those matters, a court would need to watch the videos.

The majority also relied on the fact that the examiner and lead detective were not, in their opinion, able to discern force in the videos they viewed, but that is not nearly as conclusive as to probable cause as the majority suggests. Although the lead detective documented that "[a]t no point in the video clips that I saw did I observe HOLCOMB appearing to restrain J.J. forcibly," he had viewed only "a few of the videos." ER-143. Also, a reasonable officer would recognize that force might not always be readily apparent. From a video, it is not necessarily easy to distinguish mere touching from touching with force. Furthermore, interpretation is subjective, so another viewer might have a different

interpretation. And the record shows that no one who viewed the videos thought they were so obviously exculpatory that the search had to end. The examiner sought the opinion of the lead detective and the prosecutor. After they watched "a few of the videos," the prosecutor told the examiner "to continue looking for additional surveillance videos or angles," as there were at least two video cameras in the bedroom. ER-117, 134, 143. This is more evidence that the officers acted reasonably in continuing the search. *See Messerschmidt v. Millender*, 565 U.S. 535, 553–55 (2012).

Apart from the videos, officers would reasonably have considered additional information that contributed to probable cause. Even if no force was discernible from a few videos, the officers still had J.J.'s allegations. They also knew J.J. had reported some consensual sex, so they would not expect force in every video. And there was evidence that Holcomb was lying, which made J.J.'s allegations more credible.

Holcomb claimed not to remember having sex with J.J. because he was drugged, but evidence casts doubt on that claim: Holcomb acknowledged that a hospital found no evidence of drugs; his messages to his girlfriend merely stated he was asleep; and he took photos of the sexual interaction, which seems inconsistent with being drugged. *See* ER-

133–34, 142, 147. Holcomb's message to his girlfriend stating, "I handled this shit," further suggests he may have taken steps to cover up what happened, such as deleting incriminating videos. *See* ER-133. Evidence of Holcomb's lying would have contributed to a reasonable officer's conclusion that there was still probable cause for the alleged rape, even if the video clips located thus far appeared inconclusive.

"For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Davis*, 564 U.S. at 237. Here, the price paid in freeing a child rapist far exceeds suppression's deterrence value, where there was no precedent regarding dissipation of probable cause during a warranted search and reasonable officers could have concluded that probable cause still existed after the disputed videos were found. The en banc Court should reject the majority's application of the exclusionary rule as inconsistent with Supreme Court precedent.

## II. Alternatively, the panel should rehear the case because the dissipation ruling misapprehended key facts and law

The panel's dissipation holding relied on factual findings about the recovered videos that are unsupported by the record. The panel should revisit its ruling after either supplementing the record and viewing these

videos, FRAP 10(e)(2), or remanding to the district court for fact-finding about their contents.

"[I]t is inappropriate, in reviewing an order denying a motion to suppress, for an appellate court to attempt to resolve disputed factual questions." *United States v. Carbajal*, 956 F.2d 924, 930 (9th Cir. 1992). And when interpreting an image involves subjective judgment, a court may not rely on law enforcement's opinion and cannot evaluate probable cause without reviewing the image. *United States v. Perkins*, 850 F.3d 1109, 1118–19, 1122–23 (9th Cir. 2017). Disregarding this precedent, the panel made factual findings in the first instance about videos it had never seen.

The majority concluded these videos showed "the alleged rape … almost certainly had not occurred" thus dissipating probable cause. 183 F.4th at 716. But there is no way to make this judgment—to determine whether the sexual encounter captured in the videos was forcible—without viewing these videos. If this case turns on whether probable cause dissipated, either this Court or the district court should watch the videos.

When the panel previously directed the government to provide the videos and Holcomb vehemently objected, the government did not believe it was necessary to supplement the record because Holcomb has the burden to demonstrate dissipation and, like the district court, the government believed the current record precludes such a finding. *See* Dkt-74.1. The majority disagrees. But the majority has gone further and made findings about the videos that go beyond the record. *See* pages 17–19, *supra*. The panel should instead either view the videos or remand to the district court for fact-finding in the first instance. Given the panel's opinion, FRAP 10(e)(2) justifies supplementing the record with the videos, which have become not just material but critical.

## CONCLUSION

The Court should rehear this case en banc, or the panel should rehear the case.

Dated: October 13, 2026.

Respectfully submitted,

*s/ Miriam R. Hinman*
MIRIAM R. HINMAN
Assistant United States Attorney
Western District of Washington
700 Stewart Street, Suite 5220
Seattle, Washington 98101

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form: https://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** 23-469

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel rehearing/petition for rehearing en banc/response to petition is *(select one)*:

(●) Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** 4,167 **.**
*(Petitions and responses must not exceed 4,200 words)*

**OR**

( ) In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** s/Miriam R. Hinman **Date** October 13, 2026
*(use* "s/[typed name]" *to sign electronically-filed documents)*